```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3     _____

4     UNITED STATES OF AMERICA,

5                         Plaintiff,
                                         DOCKET NO. 1:20-mj-416
6     vs.

7
      TY GARBIN,
8
                        Defendant.
9     _____/

10

11                 TRANSCRIPT OF DETENTION HEARING

12       BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

13                      GRAND RAPIDS, MICHIGAN

14                         October 16, 2020

15

16    Court Reporter:          Glenda Trexler
                               Official Court Reporter
17                             United States District Court
                               685 Federal Building
18                             110 Michigan Street, N.W.
                               Grand Rapids, Michigan 49503
19

20    Proceedings reported by machine shorthand, transcript produced

21    by computer-aided transcription.

22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3          MR. NILS R. KESSLER
            UNITED STATES ATTORNEY'S OFFICE
 4          330 Ionia Avenue, N.W.
            P.O. Box 208
 5          Grand Rapids, Michigan 49501-0208
            Phone:  (616) 456-2404
 6          Email:  Nils.Kessler@usdoj.gov

 7          MR. AUSTIN JACOB HAKES
            UNITED STATES ATTORNEY'S OFFICE
 8          330 Ionia Avenue, N.W.
            P.O. Box 208
 9          Grand Rapids, Michigan 49501-0208
            Phone:  (616) 456-2404
10          Email:  austin.hakes@usdoj.gov

11    FOR THE DEFENDANT GARBIN:

12          MR. GARY K. SPRINGSTEAD
            SPRINGSTEAD, BARTISH, BORGULA & LYNCH
13          28A West Main Street
            Fremont, Michigan 49412
14          Phone:  (231) 924-8700
            Email: gary@springsteadbartish.com
15

16          MR. MARK A. SATAWA
            KIRSCH & SATAWA, PC
17          3000 Town Center, Suite 1800
            Southfield, Michigan 48075
18          Phone:  (248) 356-8320
            Email:  Mark@kirschandsatawa.com
19

20

21                            *   *   *   *   *

22

23

24

25
```

```
 1                              Grand Rapids, Michigan
 2                              October 16, 2020
 3                              1:41 p.m.
 4              P R O C E E D I N G S
 5          THE COURT:  All right.  This is the time at which we
 6   are to take up the question of Mr. Garbin's bond.  Just for the
 7   record, AUSA Kessler and AUSA Hakes are present in the
 8   courtroom for the government.  At defense table is
 9   Gary Springstead.  Also -- Attorney Springstead and
10   Mark Satawa.  And the defendant is also present.
11              Go ahead, Mr. Kessler.
12          MR. KESSLER:  Thank you, Your Honor.
13              As with the other defendants, Your Honor, at this
14   point I think we'll be relying on evidence that's already in
15   the record.  If you would like me to put stuff up on the
16   screen, I can bring my computer up here.
17          THE COURT:  It would be helpful to me probably to ---
18   if you went through again, since we're focusing at this point
19   on a different question than we were before, namely,
20   dangerousness or risk of flight, that would probably be helpful
21   to me.
22          MR. KESSLER:  Yes, Your Honor.  If you could just
23   give me one moment, then, to get this fired up.
24          THE COURT:  Sure.
25          MR. KESSLER:  So I'll just draw your attention,
```

1    Your Honor, to a couple of exhibits.  I know we've had some

2    discussion about whether or not this is an illegal gun all by

3    itself, but as you recall we had this weapon which appears to

4    be a short-barreled rifle and it has a silencer.  And even if

5    those things were legal, they would tend to be evidence of --

6    the silencer in particular -- of wanting to use that for

7    something nefarious.

8              *THE COURT:*  Which exhibit was this again?  Can you

9    remind me the number?

10             *MR. KESSLER:*  This is Exhibit Number 7, Your Honor.

11             *THE COURT:*  Okay.

12             *MR. KESSLER:*  Exhibit Number 8 was the video of his

13   entire gun collection.  I'm happy to play that again if you

14   would like, Your Honor.  It includes this gun, but I leave that

15   to you.

16             *THE COURT:*  No, that's all right.  I remember it.

17   This was Exhibit --

18             *MR. KESSLER:*  8 was the gun room.

19             *THE COURT:*  Right.

20             *MR. KESSLER:*  Exhibit Number 9, Your Honor, was

21   Mr. Garbin's it looks like an AR-15 semiautomatic assault rifle

22   with a pistol grip, a sniper bipod, and a camouflage-covered

23   silencer, plus a very large rifle scope.  And as Agent Trask

24   discussed under oath in his original testimony on Tuesday, this

25   is a gun that's set up for just like what a sniper rifle would

1    be in the military.

2            *THE COURT:*  Am I correct, though, that it's not the

3    government's position that any of these firearms is illegally

4    owned?

5            *MR. KESSLER:*  We're not sure about the last one.  I

6    will say for the record that Exhibit 7, I believe, has been

7    sent to the ATF to take a look at whether or not it's an

8    illegal firearm.  We're not resting on the fact that it

9    necessarily is.  It may be.  With both of these, the point more

10   is they both have silencers, which we heard testimony that

11   silencers -- especially since we see that these guys use ear

12   protection during their exercises -- there's not a whole lot of

13   reason to have a silencer other than you want to conceal the

14   fact that you're firing this gun, which is what you would do if

15   you're a sniper.  So these would seem to be things that might

16   be used as tools for the plot.

17            I see you're taking notes.  If you're ready,

18   Your Honor.

19            *THE COURT:*  I am.

20            *MR. KESSLER:*  Exhibit 10 was the long discussion

21   between the group about their surveillance being compromised.

22   I focus your attention on page 11 through 13 in particular of

23   that.  And as we see here, Gunny was the name that Ty Garbin

24   went by, and he began the discussion here again about they had

25   that one person, Paul Bellar, who they believed had compromised

1    the group.   And Mr. Garbin said his story didn't add up.   And

2    as they discussed it -- let's see where he next -- you can see

3    that he talks about reaching out to somebody else if the group

4    wanted him to unless they think everything is compromised.

5    Again, the emphasis on secrecy suggests that he was intending a

6    dangerous plot.

7              And I would bring up Exhibit 16 which we just saw

8    during the preliminary hearing.   Again, as counsel pointed out,

9    he may have been responding to a discussion about the bridge,

10   but Ty Garbin says "If the bridge goes down, it also stops the

11   wave."  But that's not where it stops, Your Honor.   He also

12   volunteers in the very next message "We can always paint my

13   boat black for night fishing as well."  Again suggesting

14   something nefarious.   I think night fishing is obviously --

15   seems to be one of those code words.

16             And then we heard some testimony that I would just

17   refer to from Agent Trask yesterday about the ghost guns.   And

18   Mr. Garbin was one of the participants in that.   And just to

19   refresh the Court's recollection from Tuesday, Agent Trask

20   testified that Mr. Franks had a friend who was a convicted drug

21   dealer who couldn't buy a firearm legally and he and

22   Mr. Garb -- he and Mr. Garbin and the confidential informant

23   had discussed a plan to make illegal firearms to give to -- to

24   give to the drug dealer, which would be a violation of

25   18 U.S.C. 922(d).

```
 1              The AR-15 rifle, he gave the parts for that to the
 2     confidential informant to mill out and turn into a functional
 3     gun.  And he did the same with two semiautomatic pistols that
 4     he gave to Mr. Garbin.  And we know that those guns existed
 5     because Mr. Garbin gave them back to Mr. Franks.  And as
 6     Agent Trask testified, they were seized from Mr. Franks'
 7     residence on October 7th.
 8              THE COURT:  Can you just repeat how that plays out?
 9              MR. KESSLER:  So the gun started out they had an
10     agreement to provide those guns to Mr. Franks' friend, who is a
11     drug dealer, and that they were going -- the testimony was they
12     would sell those guns to him for three times their value to
13     raise money for their plans.
14              And there were two pistols and one semiautomatic
15     rifle that Mr. Franks wanted made from parts.  He gave the
16     parts, the lower receiver for the AR-15 rifle to the
17     confidential informant, which is in the government's possession
18     now, and he gave the parts for the pistols to Mr. Garbin to
19     make.  And Mr. Garbin did complete those guns and give them
20     back to Mr. Franks who -- and we received -- we seized the guns
21     from him on October 7th.  And those guns do not have serial
22     numbers.
23              Again shows his -- both his intent to be involved in
24     something potentially violent, his intent to commit another
25     crime, which would be to give guns to the drug dealer.  And as
```

1   we discussed with Mr. Franks, he has the ability to manufacture

2   weapons from sources that are outside of normal control.  So

3   even if this Court was to say that, you know, "You can't get

4   guns" or "We're going to put you on the nix list" or something,

5   he could still get the parts from the internet and make those

6   ghost guns for himself.

7           And I believe the last thing I would point the

8   Court's attention to is Exhibit 19.  We can bring that up.  And

9   he's the one who probably more so of anybody says "I would

10  highly advise minimizing any communication with him" -- that

11  would be Mr. Musico who wants to demonstrate publicly -- "There

12  needs to be zero and I mean zero public interaction if we want

13  to continue with our plans."  I know he's been up here

14  suggesting that he was some sort of bystander who withdrew from

15  the conspiracy, but it doesn't make any sense if right before

16  the arrest he would be telling people they needed to have "zero

17  public interaction if we want to continue with our plans."

18          *THE COURT:*  Remind me, what's the date of this text

19  message exchange?

20          *MR. KESSLER:*  I would have to check.  Do we know what

21  the date on this was?  It was after the FTX.  September 17th,

22  Your Honor.

23          *THE COURT:*  Thank you.

24          *MR. KESSLER:*  So it was in the week following the

25  FTX.  So if he actually withdrew like he's claiming, he would

1    have no reason to be talking about keeping their heads low so

2    they can continue with their plans.  I think this really

3    highlights the risk that if he was out there the plans could

4    continue and he might join up with other people or do something

5    on his own.

6              For all those reasons, Your Honor, I think he's a bad

7    flight risk.  Or a bad risk of danger to the community.  As

8    with the other defendants, the only thing suggesting he might

9    flee would be the seriousness of the charges he's facing, but

10   other than that we're not resting on that, Your Honor.

11             *THE COURT:*  Thank you.

12             Mr. Springstead or Mr. Satawa, first off, any

13   evidence?  So just to begin, first off, any evidence?  Or do

14   you intend just to argue?

15             *MR. SATAWA:*  Your Honor, the only evidence we would

16   offer would be by way of proffer and the Presentence -- and

17   Pretrial Services Report.

18             *THE COURT:*  Okay.

19             *MR. SATAWA:*  There is obviously background

20   information, verification of employment, residence, and things

21   like that that I would like to proffer onto the record for

22   purposes of the detention decision.

23             *THE COURT:*  Go ahead.

24             *MR. SATAWA:*  Your Honor, do you just want to take

25   notice of that or do you want me to enter the specific items

1    from the Pretrial Services Report that I'm referencing?

2         *THE COURT:*  No, to the extent that you're relying on

3    the Pretrial Services Report, I have, of course, read that and

4    consider that to be evidence in connection with the hearing.

5    If there was anything additional to the Pretrial Services

6    Report, I would ask you to offer that at this time, but I take

7    it there is not?

8         *MR. SATAWA:*  Your Honor, I mean, other than I don't

9    recall specifically as to whether or not the Pretrial Services

10   Report recommended a third-party custodian.  And if it did,

11   defense would proffer that Mr. -- Mr. Garbin does have his

12   parents in the courtroom on the right.  It's hard to tell

13   people apart because everyone wears masks these days.  But that

14   they are in the courtroom and they are willing to serve as

15   third-party custodians.

16        In fact, I do believe it was recommended because they

17   volunteered their home and they stated to the Pretrial Services

18   officer that they would remove any and all firearms in

19   connection with that role as third-party custodian.  And they

20   are in the courtroom, Your Honor, and they are still willing to

21   serve that function.

22        *THE COURT:*  Thank you.

23        *MR. SATAWA:*  Thank you.

24        Your Honor, before I speak of the evidence involved

25   in favor of my client, I want to start with 18 3142, the Bail

1    Reform Act.  It always strikes me as somewhat concerning that

2    the Bail Reform Act goes on for several sections and then the

3    final section, 3142(j), says "Oh, by the way, none of this

4    should be interpreted as suggesting that the defendant isn't

5    entitled to a presumption of innocence."

6              Your Honor, obviously Your Honor is well aware of the

7    client's presumption of innocence.  And it is to some extent

8    interwoven in the Bail Reform Act, at least in the last section

9    (j), but also in the Supreme Court decision upholding the

10   constitutionality of the act when Chief Justice Rehnquist wrote

11   in Solerno that sort of the constitutionality ultimately falls

12   in favor of it being supportive because we have a Speedy Trial

13   Act.  There will be 90 days.  And so we're really not talking

14   that significant a period of time.

15             Your Honor, this is obviously something that -- the

16   idea that this case will be able to go to a jury in 90 days or

17   even nine months is just not realistic.  In fact, 3142(i)(4)

18   even recognizes that if this Court were to make a judicial

19   determination of detention, that in certain cases like this

20   where there is a tremendous amount of electronic discovery,

21   where counsel can only confer with its client face-to-face,

22   it's going to be a burden and nearly impossible to prepare a

23   defense with the client given the current conditions that exist

24   in this country.  Meaning we are still in the middle of a

25   pandemic.

1              Mr. Springstead and cocounsel went and visited the

2    client for three hours on Wednesday.  They were unable to have

3    face -- hand-to-hand/face-to-face contact.  The contact was

4    still through glass.  You have to get approved for that.  The

5    visits I've had up to this point are limited to 40 minutes over

6    Zoom.  Or, of course, I can do what Mr. Springstead did and

7    appear in person.

8              Your Honor, it's going to be a burden on the defense

9    to be able to prepare this case and prepare a defense given the

10   amount of audio and video recordings involved without -- with

11   the client detained.  And again, the Bail Reform Act

12   contemplates that in subsection (i)(4).

13             Your Honor, this Court is well aware that this Court

14   is to start with the presumption that Mr. Garbin should be

15   released on personal recognizance.  Personal recognizance.

16   Before the Court should even -- can even consider restrictions.

17   And, of course, the Court is obligated to issue the

18   least-restrictive set of conditions that assures the twin

19   purposes of safety of the community and flight risk.

20             The Court has to first find that personal

21   recognizance would not be sufficient.  In analyzing that -- in

22   conducting that analysis, 3142(g) lists four factors:  The

23   nature and circumstances of the offense.  We understand the

24   offense is serious and that the penalty is life.  The weight of

25   the evidence.  The fourth factor being the nature and

1    seriousness of the danger to any person or the community that

2    would be posed by the defendant's release.

3              I want to take number 2 and 4 together.  Your Honor,

4    first of all, the Court well knows that while the strength or

5    weight of the evidence is a factor, certainly at least the

6    Ninth Circuit has ruled that it's the least significant factor,

7    United States v. Townsend, 897 F.2d. 989 (1990).

8              I think there's a reason for that, Your Honor, and

9    that is this:  As certainly implied, if not outright suggested

10   in Chief Justice Rehnquist's opinion, is this idea that we are

11   so -- we are still so early in the proceedings.  I don't fault

12   Special Agent Trask for not being able to answer every question

13   posed to him.  There are literally hundreds, if not even

14   thousands of hours of audio and videotape.  No human being

15   could be possibly expected to have reviewed all of that

16   material.  But my experience in these cases, while anecdotal,

17   comes with a warning, and that is my client in United States v.

18   Stone, that is now published authority for the purposes of a

19   presumption, was detained for over two years during the

20   pendency of that trial based on the special agent testifying at

21   the detention hearing that my client possessed tracer rounds.

22   At trial the government two years later conceded that there

23   were no tracer rounds.  Now, the FBI agent didn't lie at the

24   detention hearing, and I don't believe Special Agent Trask came

25   into this courtroom and lied about anything either, but the

1    point is that the FBI agent in that case, as well as the

2    special agent involved in this case, were relying upon

3    information given to them by others.  And in some cases second

4    and third -- second and thirdhand hearsay.

5         My client -- and that's why I think that the Bail

6    Reform Act does deemphasize the weight of the evidence in favor

7    of the other factors.

8         The third factor, Your Honor, the history and

9    characteristics of the defendant, lists 11 factors that this

10   Court is to take into account.  His character, his physical and

11   mental condition, family ties, employment, financial resources,

12   length of residence, community ties, past conduct, history of

13   drug and alcohol abuse, criminal history, and record of

14   appearance in court proceedings.  All 11 weigh overwhelmingly

15   in favor of Mr. Garbin.  There is not a single shred of

16   evidence to suggest that all 11 of those things favor

17   Mr. Garbin's release [sic].

18        He, according to the Pretrial Services Report, and

19   unlike certain statements that may have been made during this

20   preliminary exam, is not a crackpot.  He had a job.  He was an

21   airline mechanic making $28 an hour.  He owned property in the

22   district.  He worked.  He had a job.  He has a family.  He

23   lived with his grandparents.  His father, a veteran of the

24   Armed Services, including a combat veteran, who has attested

25   that he will serve as third-party custodian and who is present

1    in the courtroom along with his mother.  Strong family

2    community, family ties, employment, financial resources.  His

3    character, his past conduct.  No criminal history at all.  Not

4    even a misdemeanor criminal history that I'm aware of.  Every

5    one of those 11 factors weigh overwhelmingly in favor of

6    Mr. Garbin's release.

7              Your Honor, in following up with the discussion of

8    the law on the issue as I set the table for a minute of safety

9    to the community.  The provision that conditions reasonably

10   assure appearance and safety to the community does not require

11   a guarantee of appearance or safety, United States v. O'Brien,

12   895 810, First Circuit.  United States v. Fortna,

13   469 F.2d. 243 [sic], Fifth Circuit.  The second one is spelled

14   F-O-R-T-N-A.  It only requires an "objectively reasonable"

15   assurance of community safety.  United States v. Tortora,

16   T-O-R-T-O-R-A, 922 F.2d. 880, First Circuit.

17             "Imposition of conditions of release must be

18   supported by reasons why they are necessary to be reasonably --

19   to reasonably assure safety."  United States v. Spilotro,

20   786 F.2d. 808, Eighth Circuit (1986).

21             "Conditions designed to protect community safety,"

22   which again is what the government argues that they are relying

23   upon, "must be justified by an individualized showing that the

24   defendant 'possesses a heightened risk of misbehaving.'  The

25   government may not rely upon the fact of the arrest alone or

1    the charges or generalized law enforcement interests."

2    United States v. Scott, 450 F.3d. 863, Ninth Circuit.

3            Your Honor, when my client's admirable personal

4    record that this Court is obliged to take into account under

5    3142 -- 41 -- 3142(g) is taken into account, and it weighs so

6    strongly in favor of, of release, weighed against that is the

7    government's burden in a case involving safety of the

8    community.  That burden is that of clear and convincing

9    evidence.  The statute requires the facts that a judicial

10   officer uses to support a finding that no condition or

11   combination of conditions will reasonably assure the safety of

12   the community or other persons shall be supported by clear and

13   convincing evidence.

14           Your Honor, clear and convincing evidence means proof

15   that a particular defendant actually possesses [sic] a danger

16   to the community, not that a defendant in theory poses a

17   danger.  United States v. Patriarca, P-A-T-R-I-A-R-C-A, 948

18   F.2d. 789, First Circuit.

19           Finally, Your Honor, possession of guns alone has

20   been held as to should not be a factor that by itself

21   constitutes clear and convincing evidence of danger,

22   United States v. Jeffries, 679 F. Supp. 114, Middle District of

23   Georgia (1988).

24           Your Honor, I think that line of cases, and quite

25   frankly the theory or rationale behind them, recognizes that at

1   this early age -- stage where Mr. Garbin has had a preliminary

2   exam where this Court has found probable cause that was

3   supported by a case agent testifying on second and third

4   hearsay, who can't -- who cannot corroborate many of the

5   questions that counsel asked, specifically Mr. Springstead on

6   behalf of Mr. Garbin.  As things begin to play out or come out

7   in the discovery process, pretrial litigation, and as the case

8   proceeds forward to trial, the government says, during its --

9   both its argument in support of detention and its support of

10  bindover, this is not a case about guns, this is not a case

11  about explosives, and then it showed you a series of

12  photographs of guns to support a finding of dangerousness on

13  behalf of Mr. Garbin.

14          Exhibit 7 the government says appears to be a

15  short-barreled rifle.  Your Honor, the evidence that we have

16  been given is that it's a pistol.  It's been sent to ATF for

17  review.  It may be a short-barreled rifle.  It may be a pistol.

18  But that's the danger of relying on factors like that as

19  opposed to my client's background in making a detention

20  decision.

21          The video of the gun room.  So my client has a lot of

22  guns.  I personally own 15.  You tell somebody that who isn't a

23  gun owner and they say "What the heck do you need 15 guns for?"

24  Then I try to explain to them I have several different shotguns

25  for several different bird hunting and then I've got a gun for

```
 1    moose, a gun for deer, and a gun for this and a gun for that.
 2    So he has a lot of guns.
 3              They show you a picture of an AR-15 with a bipod and
 4    a silencer saying that this is a military sniper rifle, without
 5    any evidence that that was what Mr. Garbin intended to use it
 6    for or that that was its intended purpose.  There's no evidence that
 7    the silencers involved did not have the tax stamp or that were
 8    illegal in any way.  Two of my guns, incidentally, have bipods
 9    on them.  Bipods are very helpful if you're shooting in the
10    woods at animals, just as much as they are for shooting at
11    individuals.  Or the governor, I guess, according to the
12    government.
13              Your Honor, the ghost gun issue, again, I am limited
14    by the information that I have access to right now, as is
15    Mr. Springstead.  We don't have discovery yet or very, very
16    limited discovery.  It's my understanding that Mr. Garbin
17    assisted in the manufacture or repair of those weapons but that
18    they were never given to them or that they never had them
19    solely in his possession.  But, again, we don't know that
20    because we as Mr. Garbin's counsel are unable to give the
21    government's proffer and factual proffer any meaningful
22    rebuttal because we don't have any information other than that
23    which the government brings to this Court's attention, a
24    Complaint, an agent who says "The only thing I can tell you
25    about your client's involvement was listed in the Complaint."
```

1    He admits he's not the case agent for our client.  And what our

2    client tells us.

3         When balanced between that very, very slanted,

4    limited review of the evidence and our client's exemplary

5    record of 24 years, I submit to the Court that the

6    least-restrictive set of conditions for my client would be

7    pretrial release, home detention with electronic monitoring, a

8    third-party custodian which would be a parent one of which is a

9    veteran of the Armed Forces and still believes -- I believe

10   works for the United States Army.  There is nothing that my

11   client could do to endanger the community under that set of

12   circumstances.  If he was ordered to be at home, if he had an

13   electronic monitor that made sure he never left home, and that

14   he was kept in the charge of two honest, law-abiding citizens,

15   one of which has served this country, there is nothing that

16   society or community or any individual in this state, including

17   the governor, is not going to be any safer with Mr. Garbin

18   locked up in the Newaygo County Jail or whatever facility he

19   gets designated to than that set of conditions.  And,

20   therefore, almost by definition the least-restrictive set of

21   conditions that accomplishes the safety of the community is

22   just that.  Lock Mr. Garbin up, sure, but at home, in his

23   house, his parents' house, with an electronic monitor and a

24   designation of a third-party custodian.  Thank you.

25              *THE COURT:*  Thank you.

1    Mr. Kessler, did you have any further argument?

2    MR. KESSLER:  I just want to briefly address two

3    things that he said.  One, counsel suggested that this is --

4    all you have to rely on is secondhand.  Setting aside that

5    we've had a lot of sworn testimony and the ability to

6    cross-examine.  This is not like the Stone case that the

7    defendant keeps raising here.  We have a lot of firsthand

8    information that the Court just saw in the defendant's own

9    words.  We saw it up there.  He's the one who texted "We can

10   take down the bridge.  I'll paint my boat black for night

11   fishing."  It's undisputed that he was casing the governor's

12   house at night.  And he's the one who said that "We want zero

13   public profile if we're going to carry through with our plans."

14   Finally, counsel said there's nothing he could do if

15   he were at home on electronic monitoring.  He could leave and

16   then we wouldn't know where he was and the race would be on.

17   That's all I have.

18   THE COURT:  This matter is governed by the Bail

19   Reform Act of 1984.  Mr. Garbin, under the Bail Reform Act I

20   have to release you on bond unless I find either by a

21   preponderance of the evidence that you're a risk of flight or

22   nonappearance or by clear and convincing evidence that you are

23   a danger to the community.

24   As your counsel notes, I am required to consider the

25   least-restrictive condition or combination of conditions that

1   will reasonably assure your appearance and protect the

2   community.  And I have considered each of the possible

3   conditions set out in the statute.

4          There is no presumption in this case.  And in

5   determining whether there are sufficient conditions to

6   reasonably assure your appearance and the safety of the

7   community I'm required to consider a number of factors,

8   including the ones your attorney talked about.  Those include

9   the nature and circumstances of the offense charged, in this

10  case a very serious offense, as well as the weight of the

11  evidence.  Stone, which everyone keeps talking about, makes the

12  point that the weight of the evidence in this case is actually

13  the weight of the evidence of dangerousness.

14         I am also mindful that you are cloaked in the

15  presumption of innocence at this point.  I'm also to consider

16  the history and characteristics of the defendant, of you, and I

17  have considered that.  And as your counsel notes, you do not

18  have the history and characteristics that I often see in bond

19  hearings.  You are gainfully employed.  You own property.  You

20  are -- have no criminal history.  And I've considered all of

21  the information in the Pretrial Services Report.

22         I'm also required to consider the nature and

23  seriousness of the danger to any person or the community that

24  would be posed by your release.

25         It's worth noting, I think, that in the United States

1    versus Stone the Sixth Circuit actually reversed the court

2    which had ordered the defendant's release on bond.  It's also

3    worth noting, as I think the government concedes, that in a

4    different case, any case that does not involve the incredible

5    dangerousness that is considered here, that someone with your

6    record would not be -- would not -- would be an appropriate

7    candidate for bond.

8         I also disagree with Mr. Satawa that the restrictions

9    that are suggested by the Pretrial Services Report would be

10   sufficient, and I'll get to that in a minute.  But Mr. Kessler

11   is correct that there is nothing about a tether and being at

12   your parents' home that would prevent you from leaving and

13   continuing the conspiracy, or the plot at least, that you had

14   previously undertaken either in that form or in a different

15   form.

16        I don't ever expect and it is unreasonable to expect

17   that parents can be mindful vigilants at all times for their

18   children.  They are not law enforcement officers.  And there is

19   nothing to suggest that they would help the defendant, but they

20   certainly can't be tasked with that requirement.

21        Focusing a little bit more on the history of this

22   case and the evidence.  And I am mindful, very mindful of the

23   fact that there is an incomplete record that -- by necessity,

24   otherwise we would have had a trial already -- there is an

25   incomplete record of the offense conduct in this case and that

1    the defendant is presumed to be innocent.  But Mr. Garbin's

2    involvement in this plot dates back further than some of the

3    other defendants whom I have already detained.

4              Back in June, June 18, he and Fox discuss planning to

5    attack the Capitol.  That seems to be Mr. Fox driving that

6    discussion.  But Mr. Garbin's involvement in this does go back

7    much further.

8              On June 20 the two of them met at the Vac Shack and

9    discussed plans for assaulting the Capitol, encountering law

10   enforcement/first responders, and using Molotov cocktails to

11   destroy police vehicles.  So the repeated -- and I've, of

12   course, in the last hearing discussed the later incidents

13   involving -- or the later incidents that are a part of the

14   evolution of the plot in this case, but the -- Mr. Garbin's

15   history in this conspiracy goes back much further.  And while

16   the Court certainly considers the fact that there are facts

17   that are not before the Court and that there is incomplete

18   information about the offense, there is sufficient information

19   to note that the defendant has demonstrated -- or the

20   government has demonstrated that the defendant's conduct has

21   continued from a much earlier stage in the conspiracy than

22   others.

23             In addition, from the first it appears his

24   discussions include encountering law enforcement/first

25   responders and destroying police vehicles, which raises the

1    issue of how he could be appropriately supervised by

2    United States Probation, which would be the absolute bare

3    minimum requirement for being able to be released on bond where

4    there is this dangerousness to the community.  And I should

5    probably at least note that I am convinced that the defendant

6    would pose an ongoing danger to the community.  First because

7    the behavior up until now has demonstrated that that was his

8    intent, specifically to mount an offensive that in some way

9    would attempt to take on the government.  Specifically by

10   kidnapping the governor but also considering other options as

11   were discussed with coconspirators along the way.  The evidence

12   of that is ample.

13            There is more than a heightened risk of misbehaving

14   here.  There is also the ghost gun evidence.  And while the

15   evidence of that is, again, not in the full form that it would

16   be were this a trial, I have to take notice of the fact that

17   Mr. Garbin has the ability to take parts and create a firearm.

18   So just saying that we'll remove the firearms from his home

19   also doesn't give the Court confidence, does not -- is not a

20   condition that will reasonably assure the safety of the

21   community.  He has access to other individuals who are able to

22   help.  He has access to the -- he has the knowledge, I should

23   say, to continue in the path that he has been on at least since

24   June.

25            This is not theoretical danger.  The fact that he is

1    involved, as the government notes, in casing the governor's

2    house at night indicates the seriousness with which he took

3    this endeavor.  The discussion of blowing up the bridge

4    underlines the seriousness of the plan.  His involvement in the

5    October 7 meeting to make payment on explosives and tactical

6    gear for the purpose of the mission.  All of those which happen

7    over time indicate a persistent and dedicated interest in

8    continuing this plot against a duly elected government

9    official.

10           So I don't -- I take Mr. Satawa's point that lots of

11   people have lots of guns, there's nothing illegal about that.

12   The government at this point at least isn't suggesting that

13   Mr. Garbin's possession of guns is illegal.  What they are

14   suggesting is that the purpose of the possession of those

15   firearms was illegal.  It was for the kidnapping of the

16   governor or otherwise countering police interference with that

17   plan.

18           So I do find -- I should say I don't find by a

19   preponderance of the evidence that he is a risk of flight.  I

20   just don't think there's enough here given the

21   Pretrial Services Report and its indication of his ties to the

22   community.  But I do find by clear and convincing evidence, I

23   think there is clear and convincing evidence that he is a

24   danger to the community.  And I don't believe that I can impose

25   a condition or combination of conditions that would reasonably

1    assure the community's safety based on the evidence before me

2    at this time.

3              I understand Mr. Satawa's concern about his ability

4    to prepare for trial.  That is something that may be taken up

5    down the road should it become an actual issue in preparing for

6    trial as opposed to what is currently before me, but the

7    question before me is whether or not there is any condition or

8    combination of conditions at this point that I can impose that

9    would reasonably assure the safety of the community.  And I

10   find that there's clear and convincing evidence that there is

11   not.

12             So, Mr. Garbin, what that means is that you will be

13   held in United States Marshals' custody pending further

14   proceedings, and we will issue an order setting a status

15   conference a couple/three weeks out now at this point.

16             Mr. Garbin, did you understand everything that

17   happened in court today?  I understand you probably don't agree

18   with my decision, but do you understand everything that

19   happened in court today?

20             *DEFENDANT GARBIN:*  Yes, Your Honor.

21             *THE COURT:*  All right.  Anything else we need to take

22   up, Mr. Kessler?

23             *MR. KESSLER:*  No, Your Honor.

24             *THE COURT:*  Mr. Springstead or Mr. Satawa?

25             *MR. SPRINGSTEAD:*  No, Your Honor.

1          *THE COURT:* All right.  Then we'll be adjourned.

2       *(Proceeding concluded at 2:22 p.m.)*

3                     *   *   *   *   *

4                          CERTIFICATE

5          I certify that the foregoing is a transcript from the

6    Liberty Court Recording System digital recording of the

7    proceedings in the above-entitled matter, transcribed to the

8    best of my ability.

9          I further certify that the transcript fees and format

10   comply with those prescribed by the court and the Judicial

11   Conference of the United States.

12

13   October 28, 2020

14                          /s/ Glenda Trexler
                            Glenda Trexler, CSR-1436, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25