UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,

vs.

TY GERARD GARBIN,

             Defendant.

_____/

No. 1:20-cr-183

Hon. Robert J. Jonker
Chief United States District Judge

PLEA AGREEMENT

This constitutes the plea agreement between Ty Gerard Garbin and the United States Attorney's Office for the Western District of Michigan. The terms of the agreement are as follows:

1.    <u>The Defendant Agrees to Plead Guilty.</u>    The defendant agrees to plead guilty to the indictment, which charges him with kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c).

2.    <u>The Defendant Understands the Crime.</u>    In order for the defendant to be guilty, the following must be true:

    a.  Two or more persons agreed to commit the federal offense of kidnapping;

    b.  The defendant knowingly and voluntarily joined that agreement; and

    c.  A member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

The defendant is pleading guilty because he is guilty of the charge described above.

3.    The Defendant Understands the Penalty.    The statutory maximum sentence that the Court can impose is imprisonment for life, a fine of $250,000, five years of supervised release, and a $100 special assessment.

4.    Mandatory Restitution.    The defendant understands that he will be required to pay full restitution as required by law.

5.    Asset Forfeiture and Financial Accountability.    The defendant agrees to fully cooperate with the federal government in the seizure and forfeiture of assets, to include any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the offense of conviction, kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c), and any property used, or intended to be used, in any manner or part, to commit, or to facilitate a conspiracy to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a. The defendant agrees that illegal proceeds obtained as the result of the kidnapping conspiracy are subject to forfeiture pursuant to 19 U.S.C. §§ 1607-09 by 18 U.S.C. § 981(d) (administrative forfeiture), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 (criminal and civil forfeiture), that any proceeds or property used, or intended to be used, to facilitate a conspiracy to use weapons of mass destruction are subject to forfeiture pursuant to 19 U.S.C. §§ 1607-09 by 18 U.S.C. § 981(d) (administrative forfeiture), 18 U.S.C. §§ 981(a)(1)(C), (G) and 28 U.S.C. § 2461 (criminal and civil forfeiture), and that any firearm or ammunition involved in or used in any violation of any other criminal law of the United States are subject to forfeiture pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

Specifically, the defendant consents to administrative forfeiture by the Federal Bureau of Investigation, and if necessary, the defendant consents to civil forfeiture in a future civil judicial

2

forfeiture proceeding of any and all assets seized, including any firearms and ammunition, from the following locations on October 7, 2020 and October 8, 2020:

   a.  a search of the defendant's person;

   b.  1662 Lansing Avenue, Hartland, Michigan;

   c.  a 2020 Ford F150 VIN: 1FTEW1E41LFB18548 parked at 1662 Lansing Avenue, Hartland, Michigan; and

   d.  property located in Ellsworth Township, Luther, Michigan, plot described as Property ID 080170050.

The defendant agrees that there was reasonable cause to search these locations and seize all assets from these locations on October 7, 2020 and October 8, 2020, and that the assets are subject to forfeiture by the federal government as either illegal proceeds or property that was used or intended to be used to violate federal criminal law, or as firearms and ammunition involved in or used in violations of federal criminal law. The defendant agrees to waive any and all rights in any administrative or future civil judicial forfeiture proceeding regarding these assets. The defendant also agrees to sign any paperwork that is necessary to ensure that the administrative or civil judicial forfeiture of these assets is completed.

The defendant also agrees not to assist any other individual in contesting the forfeiture of the assets described above in any type of subsequent administrative, civil, or criminal forfeiture proceeding. The defendant further agrees to cooperate with the federal government in any type of subsequent administrative, civil, or criminal forfeiture proceeding and that such cooperation may include, but not be limited to, providing truthful testimony in a future civil or criminal forfeiture hearing. The defendant also agrees to prevent the disbursement of any and all assets

subject to this forfeiture provision if said disbursements are within the defendant's direct or indirect control.

      6.    <u>Factual Basis of Guilt</u>.    The defendant and the U.S. Attorney's Office stipulate to the following statement of facts which need not be proven at the time of the plea or sentencing:

      a.    At all times relevant to the indictment, the defendant, Daniel Joseph Harris ("Harris"), Kaleb James Franks ("Franks"), and Brandon Michael-Ray Caserta ("Caserta") were members of the Wolverine Watchmen, a Michigan-based self-styled "militia" group.

      b.    On or about June 14, 2020, another member of the Wolverine Watchmen introduced members of the group to Adam Dean Fox ("Fox"), who said he wanted to join forces with other "militia" groups in Michigan to work toward common goals.

      c.    On or about June 18, 2020, the defendant, Harris and other members of the Wolverine Watchmen leadership met Fox in person at a "Second Amendment Rally" outside the Michigan State Capitol. Fox said he wanted to recruit 200 people to storm the Capitol, try any politicians they caught for "treason," and execute them by hanging on live television.

      d.    On or about June 20, 2020, the defendant and other Wolverine Watchmen leaders met Fox in the basement of his place of employment in Grand Rapids, Michigan. Fox collected the attendees' cell phones before beginning the meeting for operational security. Fox told the group he and Barry Gordon Croft, Jr. ("Croft") had attended a meeting of "like minded individuals" in Dublin, Ohio in June, where they discussed "fixing" their local governments and removing "tyrants" from office. Fox reiterated the plan to storm the Michigan State Capitol, and proposed using Molotov cocktails and other improvised explosive devices ("IEDs") to distract and hinder law enforcement during the operation. Fox also proposed kidnapping the Governor of

4

Michigan ("the Governor") and holding her for trial at an alternate location. Fox told the defendant that Croft wanted to "restore our Constitutional rights by any means," and was willing to travel to Michigan to help execute whatever plan they decided on.

   e. On or about June 28, 2020, the defendant met with Fox, Harris, Franks, Caserta, and other members of the Wolverine Watchmen for a "tactical training" in Munith, Michigan. Fox told them about the plan to storm the State Capitol and hang the Governor. Harris, Franks, Caserta and others indicated their assent either verbally or by nodding.

   f. On or about July 11-12, 2020, the defendant, Fox, Croft, Harris, Franks, Caserta and others attended a "field training exercise" in Cambria, Wisconsin. At that training, the conspirators again discussed the plan to storm the Capitol and kidnap the Governor. Fox said the Capitol might be a difficult target and suggested the group should consider alternate locations in more remote areas. The group discussed assaulting the Governor's official summer residence on Mackinac Island, or her private vacation home (the "vacation home") in northern Michigan in the Western District of Michigan.

   g. At the field training exercise in Cambria, the defendant, Fox, Harris, Franks, Caserta and others constructed a "shoot house" from plywood, shipping pallets and a door frame. The conspirators practiced breaching the "shoot house" with firearms, to simulate assaulting the Capitol or elsewhere. The conspirators also practiced combat first aid, including applying tourniquets, applying bandages, treating cuts, burns, and gunshot and shrapnel wounds they might receive during a firefight with law enforcement.

   h. At the field training exercise in Cambria, Croft brought a modified AR-15 type semiautomatic assault rifle, equipped with a shortened barrel, a silencer, and a 37-millimeter projectile launcher. Croft told the conspirators they could use the rifle to launch smoke, flash, or

5

explosive grenades against police. Croft also brought materials to construct IEDs, including gunpowder, shrapnel and fireworks wicks for ignition. Croft told the defendant the IEDs could be used to stop or distract law enforcement, including by using them against a convoy of police vehicles. Harris and Croft unsuccessfully attempted to detonate one device. The defendant assisted Harris and Croft in attempting to detonate a second device, also unsuccessfully.

    i.  On or about July 18, 2020, the defendant, Fox, Croft, Franks, Harris and others attended a meeting of self-styled "militia" representatives from several states, in Peebles, Ohio. At the meeting, Croft proposed firebombing a Michigan State Police outpost as a distraction while they stormed the Capitol. Fox told the conspirators that the Governor's vacation home would be an easier target because it could be reached by road or water, and there were no police nearby. The conspirators agreed the Capitol would be too hard of a target and began planning instead to assault the vacation home.

    j.  On or about August 9, 2020, the defendant, Fox, Harris, Franks, Caserta and others met for a training exercise in Munith, Michigan. Fox again raised the plan to kidnap the Governor. The conspirators discussed timing of the plan and what to do with the Governor after capturing her. The defendant advocated waiting until after the national election, when the conspirators expected widespread civil unrest to make it easier for them to operate.

    k.  On or about August 23, 2020, the defendant met Harris, Franks, Caserta and others at Harris' residence in Lake Orion, Michigan. The conspirators were concerned that their group had been infiltrated by law enforcement, and brought several forms of identification to prove they were not undercover informants or government agents. At Harris' suggestion, the conspirators switched to a new encrypted messaging application to maintain operational security. During the meeting, a government informant observed that Fox seemed preoccupied with killing

the Governor. Caserta responded, "The blood of tyrants needs to be shed," or words to that effect. Franks advised the other attendees that he had spent approximately $4,000 on a bullet proof helmet and a night vision scope.

l.     On or about August 29, 2020, Fox conducted a daytime surveillance of the Governor's vacation home in northern Michigan. Fox had invited the defendant and other conspirators to accompany him on an earlier date, but postponed the trip when the group suspected they had been infiltrated by law enforcement. After returning from the surveillance, Fox posted pictures and video of the vacation home to the conspirators' encrypted group chat. In a private chat with a government informant the next day, the defendant texted "if the bridge goes down it will stop the wave," suggesting that taking down a nearby bridge would hinder a police response to the kidnapping. The defendant also offered to paint his boat black for a future night reconnaissance of the vacation home.

m.     On or about September 12-13, 2020, the defendant, Fox, Croft, Franks, Harris and Caserta attended a "field training exercise" at the defendant's property near Luther, Michigan, in the Western District of Michigan. The conspirators assembled another "shoot house" to simulate the vacation home, and practiced assaulting it with firearms. In addition, the conspirators constructed a range for live-fire training, using the defendant's front-end loader and approximately 400 used tires provided by Franks.

n.     Throughout the day on September 12, 2020, the defendant and the other conspirators discussed their plans to kidnap the Governor. In the afternoon, Fox told the defendant, Harris, Franks, Caserta and others that he wanted to take the Governor out into the middle of lake Michigan on a boat, remove the engine, and leave her there to be rescued as a "statement."

o.      Later on September 12, 2020, Fox gathered Croft, Franks, Harris, Caserta
and others to plan a nighttime surveillance of the Governor's vacation home. Based on their
previous discussions, the conspirators all knew the purpose of the trip was to see how the area
looked in the dark, because they expected to kidnap the Governor at night.

p.      The night of September 12, 2020, Fox, Croft, Franks, the defendant and
others drove from the defendant's property near Luther, Michigan to the vacation home in three
cars. Franks was armed with a Glock 19 semiautomatic pistol. Fox was armed with a Taurus G3
semiautomatic pistol. The group could not find Harris or Caserta when it was time to depart, and
they remained behind. Harris told the defendant the next morning that he regretted not going
along.

q.      Before reaching the vacation home, Fox gave the other surveillance group
members mission tasks. Fox said he, Croft, and "Red" (who was, unbeknownst to them an
undercover FBI agent) would drive to the public boat launch across the lake from the vacation
home. Fox told the defendant, Franks and another individual to drive to the vacation home in the
second car and attempt to signal them across the lake with a flashlight. Fox instructed two other
individuals to drive around in the third car to make sure no one was following them. Fox told the
defendant and the other conspirators to give him a 10-minute head start, so he and Croft could
inspect a highway bridge along the way. After completing the surveillance, Fox told the
defendant, Franks and the others that he and Croft had found a good place to leave explosives
under the bridge. At around 2:00 a.m. on September 13, the defendant and the other members of
the surveillance team returned to the defendant's property near Luther.

r.      The morning of September 13, 2020, the defendant, Fox, Croft, Harris,
Franks, Caserta and others gathered where they had parked their vehicles on the defendant's

property. Fox asked everyone present to contribute toward the $4,000 they would need to buy an explosive device large enough to destroy the bridge. Fox told the conspirators they would have to be "opportunistic," and be ready to execute the plan when the Governor was at the vacation home. To that end, he told the conspirators they would need to continue conducting "recons" and gathering "local intel" to learn her travel patterns.

        s.     During the morning debriefing on September 13, 2020, Fox, Croft, Harris, Franks, Caserta and others discussed fighting the Governor's security detail, including the possibility that she would have a Secret Service detail if Joseph Biden were elected President and appointed her to a cabinet position. Croft suggested putting a shoulder-fired weapon in the back of a pickup truck to use against the lead vehicle in the Governor's convoy, and said he had brought the "thirty-seven" (AR-15 with 37-millimeter projectile launcher) for that purpose. Croft also advocated using incendiary devices and IEDs against the convoy.

        t.     On or about September 17, 2020, Fox told the defendant, Harris, Franks and Caserta in an encrypted chat that they had been invited to participate in an armed protest at the State Capitol. The defendant responded that, "[T]here needs to be zero and I mean zero public interaction if we want to continue with our plans," by which he meant their plans to kidnap the Governor. Caserta agreed, "No more protests … it's too hot," and Franks added, "Hard pass on anything in the public."

        u.     On or about September 19, 2020, Fox told the defendant, Harris, Franks and Caserta in an encrypted chat that he was preparing the basement of his place of employment for "a CQC (Close Quarters Combat) training here clearing this big ass building upstairs and down" to "work on acquiring an asset and detaining for extraction." The defendant knew the "asset" they would be practicing to detain and extract was the Governor. Caserta responded,

"That sounds pretty tight." Fox told the defendant he had a Taser and zip ties, which he said would be good for "neutralizing" the Governor.

        v.      On or about October 7, 2020, the defendant, Fox, Harris and Franks traveled to Ypsilanti, Michigan to meet undercover FBI agent "Red," not knowing the meeting was a ruse to facilitate their arrest. After they were booked and lodged in pretrial custody, Fox told the defendant he had brought cash with him as a good faith down payment for explosives.

        7.    <u>Cooperation in Criminal Investigations</u>.    The defendant agrees to fully cooperate with the FBI, the U.S. Attorney's Office, the Michigan State Police, the Michigan Attorney General, and any other law enforcement agency in their investigation of the charges contained in this indictment, as well as the investigation of crimes over which they have actual or apparent jurisdiction. The defendant's cooperation will consist of all steps needed to uncover and prosecute such crimes, including, but not limited to, providing investigators with a full, complete and truthful statement concerning his knowledge of any and all criminal activity of which he is aware; truthfully answering investigators' questions; meeting with prosecutors before testifying; truthfully testifying before grand juries and in any court proceedings; and providing all relevant tangible evidence in his possession or under his control, including, but not limited to, objects, documents, and photographs. The defendant's obligation to cooperate under this paragraph is an affirmative one and includes the obligation to voluntarily come forward with any and all information which he should reasonably know will assist in the investigation of other criminal activity. The defendant will not commit any criminal offense during the course of his cooperation with the United States. The defendant will submit to polygraph examination upon request. The defendant's obligation under this paragraph is a continuing one and shall continue

after sentencing until all investigations and prosecutions in which his cooperation is deemed relevant by the U.S. Attorney's Office have been completed.

      8.    <u>The U.S. Attorney's Office Agrees</u>:

      a.    <u>No additional charges</u>.    The U.S. Attorney's Office agrees not to file additional charges against the defendant arising out of the conspiracy to kidnap as charged in the indictment, including conspiracy to use weapons of mass destruction in violation of 18 U.S.C. § 2332a, and possession of unregistered weapons and destructive devices in violation of 26 U.S.C. § 5861, provided that the conduct is disclosed to the Government by the defendant or his attorney prior to the date of this agreement. This promise of non-prosecution shall not include any crimes of violence or criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371) that are entirely unrelated to the conspiracy to kidnap charged in the indictment.

      b.    <u>Acceptance of Responsibility</u>.    The U.S. Attorney's Office agrees not to oppose the defendant's request for a two-level reduction of his offense level for acceptance of responsibility under Section 3E1.1(a) of the Sentencing Guidelines. However, the U.S. Attorney's Office reserves the right to object to such request if it subsequently learns of conduct by the defendant that is inconsistent with the criteria set forth in the Commentary to Section 3E1.1. Should the Court grant a two-level reduction as provided herein, the U.S. Attorney's Office will move the Court to grant an additional one-level reduction if the adjusted offense level is 16 or greater pursuant to Section 3E1.1(b).

      c.    <u>Protection for Proffered/Cooperative Statements</u>.    The U.S. Attorney's Office agrees that information provided by the defendant through his proffer, and any information provided pursuant to his promise to cooperate as described in this agreement, will

not be used by the Government to enhance his sentence, in accordance with Sentencing

Guidelines § 1B1.8, and according to the terms of the written agreement entered into between the

parties immediately prior to the proffer.  It is expressly understood, however, that such

information may be used by the Government at sentencing if the defendant takes a position at

sentencing that contradicts information he provided pursuant to this agreement or any proffer

agreement.

> d.    <u>Possibility of Sentence Reduction Motions</u>.    The U.S. Attorney's Office

will decide whether to file a motion for departure or reduction of sentence pursuant to

Sentencing Guidelines § 5K1.1, 18 U.S.C. § 3553(e), and/or Rule 35(b) of the Federal Rules of

Criminal Procedure.  The defendant fully understands that such a motion may be made pursuant

to law if, and only if, his fully cooperates with the Government and materially and substantially

assists the Government in the investigation or prosecution of others.  The determinations of

whether the defendant has provided substantial assistance to the United States, or to designated

state or local law enforcement authorities, and of which type of motion to file, will be made in

the sole discretion of the U.S. Attorney's Office.  The defendant fully understands that this

paragraph is not a promise by the Government to file a motion for departure or to reduce a

sentence.  Additionally, the defendant understands that, even if such a motion were filed, the

Court has complete discretion to grant or deny the motion.  Furthermore, if the Court were to

grant the motion, the Court–not the Government–would decide how much of a departure or

sentence reduction the defendant receives based upon the nature and extent of his assistance.

The defendant understands that any departure or sentence reduction will be limited by the

statutory mandatory minimum unless the Government files a written motion to release the

mandatory minimum.  The defendant acknowledges and agrees that he may not appeal the

Court's exercise of its discretion in granting or denying a motion for departure or reduction of sentence, if such a motion is made.

9.     <u>The Sentencing Guidelines</u>.    The defendant understands that although the United States Sentencing Guidelines (the "Guidelines") are not mandatory, the Court must consult the Guidelines and take them into account when sentencing him. The defendant understands that the Court, with the aid of the presentence report, will determine the facts and calculations relevant to sentencing. The defendant understands that he and his attorney will have the opportunity to review the presentence report and to make objections, suggestions, and recommendations concerning the calculation of the Guideline range and the sentence to be imposed. The defendant further understands that the Court will make the final determination of the Guideline range that applies in this case, and may impose a sentence within, above, or below the Guideline range, subject to the statutory maximum penalties described elsewhere in this agreement. The defendant further understands that disagreement with the Guideline range or sentence shall not constitute a basis for withdrawal of his plea.

10.     <u>There Is No Agreement About The Final Sentencing Guidelines Range</u>.     The defendant and the U.S. Attorney's Office have no agreement as to the applicable Sentencing Guidelines factors or the appropriate guideline range. Both parties reserve the right to seek any sentence within the statutory maximum, and to argue for any criminal history category and score, offense level, specific offense characteristics, adjustments and departures.

11.     <u>Waiver of Constitutional Rights</u>.     By pleading guilty, the defendant gives up the right to persist in a plea of not guilty and the right to a speedy and public trial by jury or by the Court. As a result of the defendant's guilty plea, there will be no trial. At any trial, whether by jury or by the Court, the defendant would have had the following rights:

      a.     The right to the assistance of counsel, including if he could not afford an attorney, the right to have the court appoint an attorney to represent him;

      b.     The right to be presumed innocent and to have the burden of proof placed on the government to prove his guilt beyond a reasonable doubt;

      c.     The right to confront and cross-examine witnesses against him;

      d.     The right, if he wished, to testify on his own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify;

      e.     The right not to be compelled to testify, and, if he chose not to testify or present evidence, to have that choice not be used against him.

By pleading guilty, the defendant also gives up any and all rights to pursue in this court or on appeal any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

12.    <u>Limited Waiver of Appeal and Collateral Attack</u>.

      a.     <u>Waiver</u>:   In exchange for the promises made by the government in entering this plea agreement, the defendant waives all rights to appeal or collaterally attack his conviction, sentence, or any other matter relating to this prosecution, except as listed below.

      b.     <u>Exceptions</u>:   The defendant may appeal or seek collateral relief to raise a claim, if otherwise permitted by law in such a proceeding, on the following grounds:

          i.    The sentence on any count of conviction exceeded the statutory maximum for that count;

          ii.    The sentence was based on an unconstitutional factor, such as race, religion, national origin, or gender;

          iii.    The district court incorrectly determined the Sentencing Guidelines range, if the defendant objected at sentencing on that basis;

      iv. The sentence is above the Sentencing Guidelines range as determined by the court at sentencing and is unreasonable;

      v. The guilty plea was involuntary or unknowing;

      vi. An attorney who represented him during the course of this criminal case provided ineffective assistance of counsel.

13. <u>FOIA Requests.</u> The defendant hereby waives all rights, whether asserted directly or by representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

14. <u>Hyde Waiver.</u> The defendant acknowledges, by his voluntary admission of guilt, that the position of the U.S. Attorney's Office in this case is not vexatious, frivolous, or in bad faith, and he hereby disclaims and waives any right to make any claim for attorney fees.

15. <u>The Court Is Not a Party to This Agreement.</u> The defendant understands that the Court is not a party to this agreement and is under no obligation to accept any recommendation by the U.S. Attorney's Office or the parties regarding the sentence to be imposed. The defendant further understands that, even if the court ignores such a recommendation or imposes any sentence up to the maximum established by statute, he cannot, for that reason withdraw his guilty plea, and he will remain bound to fulfill all his obligations under this agreement. The defendant understands that no one can make a binding prediction or promise regarding the sentence that he will receive, except that it will be within the statutory maximum.

16. <u>This Agreement Is Limited to the Parties.</u> This agreement is limited to the U.S. Attorney's Office for the Western District of Michigan, and cannot bind any other Federal, State

or local prosecuting, administrative or regulatory authority. This agreement applies only to crimes committed by the defendant. This agreement does not apply to or preclude any past, present, or for future forfeiture or civil actions.

17.     <u>Consequences of Breach</u>.      If the defendant breaches any provision of this agreement, including any promise of cooperation, whether before or after sentencing, the United States shall have the right to terminate this agreement, or deny any or all benefits to which the defendant would otherwise be entitled under its terms. In the event the United States elects to terminate this agreement, the agreement shall be considered null and void, and the parties shall return to the same position they were in prior to the execution of this agreement, as though no agreement ever existed. In such event, the defendant shall remain liable for prosecution on all original charges, and the United States shall be free to bring such additional charges as the law and facts warrant. The defendant further agrees to waive and forever give up his right to raise any claim that such a prosecution is time-barred if the prosecution is brought within one year of the breach that gives rise to the termination of this agreement.

18.     <u>This is the Complete Agreement</u>.      This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties. No other promises have been made, nor may any additional agreements, understandings or conditions be entered into unless in writing signed by all parties or on the record in open court.

ANDREW BYERLY BIRGE
United States Attorney

_1/26/21_
Date

NILS R. KESSLER
Assistant United States Attorney

I have read this agreement and carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_____1/26/21_____
Date

_____
TY GERARD GARBIN
Defendant

We are Ty Gerard Garbin's attorneys. We have carefully discussed every part of this agreement with our client. Further, we have fully advised our client of his rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To our knowledge, our client's decision to enter into this agreement is an informed and voluntary one.

_____1/26/21_____
Date

_____
MARK A. SATAWA
Attorney for Defendant

_____01/26/2021_____
Date

_____
GARY K. SPRINGSTEAD
Attorney for Defendant