UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

CASE NO.: 1:20-CR-183-3

v.

HON. ROBERT J. JONKER

TY GERARD GARBIN,

    Defendant.

---

**DEFENDANT TY GARBIN'S SENTENCING MEMORANDUM**

---

### I. SUMMARY

Mr. Ty Garbin has pled guilty to one count of conspiring to kidnap the Governor of Michigan. The penalties for this offense range from no incarceration or "any term of years," up to a maximum penalty of life in prison. 18 U.S.C. § 1201. The sentencing guidelines suggest a sentence of 168 to 205 months as a starting point for this offense, before any downward departures. However, when the sentencing factors set forth in 18 U.S.C. § 3553(a) are taken into account, Mr. Garbin respectfully submits that a sentence well below the advisory guideline range is warranted for the following reasons:

    A.    Mr. Garbin has demonstrated extraordinary acceptance of responsibility for his actions, *viz.*, immediately cooperating with the government at the time of his arrest, pleading guilty relatively soon after arrest, and being the first and only defendant to plead guilty and cooperate with the government thus far;

    B.    Mr. Garbin, a man of slight build, will be particularly vulnerable to physical assault or even death in prison due to his cooperation in this case;

    C.    Prior to this case, Mr. Garbin had a completely clean criminal history;

<blockquote>

D. Mr. Garbin overcame years of physical and verbal abuse at the hands of his biological father to become a certified aviation mechanic at a young age, worked full-time, earned good money, and used his talents and skills for a positive purpose;

E. Mr. Garbin was particularly vulnerable to becoming involved in extremism because of the very same abuse he experienced from his biological father (*see* Attachment A - Sentencing Mitigation Video (Video), Attachment B - Dr. Atara Abramsky's Psychological Evaluation (Dr. Abramsky's Report), Attachment C - Parents for Peace Report); and,

F. Mr. Garbin has already engaged in and is committed to completing deradicalization treatment with Parents for Peace and eager to help deradicalize others involved in extremism at the conclusion of this case (s*ee* Video and Parents for Peace Report).

</blockquote>

In support of this position, Mr. Garbin respectfully submits this Sentencing Memorandum and its attachments, which include:

>Attachment A -   Sentencing Mitigation Video (Video);
>Attachment B -   Dr. Atara Abramsky's Psychological Evaluation (Dr. Abramsky's Report);
>Attachment C  -  Parents for Peace Report;
>Attachments D - S - Letters of Support; and,
>Attachment  T -  ATF Letter to Mr. Garbin dated July 27, 2020.

In addition, Mr. Garbin is filing a Motion for Variance under 18 U.S.C. 3553(a) and Brief in Support as a separate docket entry, per the Local Rule 32.2(g).

## II.    APPLICATION OF THE 18 U.S.C. 3553(a) SENTENCING FACTORS TO MR. GARBIN

### Nature and Circumstances of the Offense

On January 27, 2021, Mr. Garbin pled guilty to Count One of the original Indictment in this case. (*See* Minutes of Change of Plea, ECF No. 143, Indictment, ECF No. 86).  Count One charged Mr. Garbin and his codefendants with conspiring to kidnap the Governor of the State of Michigan. (Indictment, ECF No. 86). While it appears the defendants had no agreement about what to do with the Governor if her kidnaping actually came to fruition, their disparate ideas ranged from the absurd, such as abandoning her (alive) in a disabled boat in Lake Michigan, to potentially

2

deadly, putting her on trial for the crime of treason. Fortunately, the plot never came to fruition, and nobody was harmed.

Mr. Garbin's involvement in this plot stemmed from his frustration with the state-mandated shutdowns during the Covid-19 pandemic. As the economy ground to a halt, his regular $28 per hour wages were halved when he was paid "stand by" pay instead of being laid off. (Mr. Garbin's Presentence Investigation Report (PSR), Case 120-cr-00183-RJJ, ECF No. 202, Page ID.1076, Filed 05/27/21, Page 26 of 31, ¶ 130). According to Mr. Garbin, this paid him a few hundred dollars less per pay period than he would have received from unemployment pay.

During his downtime, he sought out other similarly frustrated or aggrieved people on the internet, eventually finding a Facebook group called the Wolverine Watchmen, which consisted of a group of extremists. (PSR at PageID.1057, Page 7 of 31, § 20). There, he found others who were equally upset about how the pandemic was being handled, but who were also willing to do something about it rather than just complain.

For Mr. Garbin, doing something about it just felt right. (PSR, Page ID.1070-1072, Pages 20-22 ¶ 90). Mr. Garbin felt it was profoundly unfair that one person's decision to shut down the economy could impact his life and so many others' lives and leave them with no control or choice. (*Id*). Action seemed like the only way to assert control over his individual life and to redress the imbalance of power between citizens and government during the pandemic in particular. Afterall, what the Governor was doing was unprecedented and, many thought, lawless. Even the President of the United States of America called on citizens to "LIBERATE MICHIGAN!" (Washington Post, April 17, 2020, available at: https://www.washingtonpost.com/outlook/2020/04/17/liberate-michigan-trump-constitution/).

3

Against this backdrop, it is not that surprising that Mr. Garbin answered the call. He was skeptical of unchecked government power to begin with, young and impulsive, personally aggrieved, and psychologically predisposed to try to control his feelings of anxiety and vulnerability by taking control of a situation. (*See* Attachments A - Video; B - Dr. Abramsky's Report; and C - Parents for Peace Report).

Mr. Garbin and his co-conspirators, however, were not sure about exactly what to do. Some, like Mr. Garbin, protested at the Michigan State Capitol Building in Lansing, Michigan. (PSR, PageID.1058, ¶ 26). Others wanted to participate in an armed protest at the Capitol, though Mr. Garbin did not. (PSR, PageID1058, ¶ 27; PageID 1059, ¶ 33). Some wanted to storm the Capitol and take it over by force. (PSR, PageID1058, ¶ 27). Mr. Garbin, for his part, thought storming the Capitol was a stupid idea and destined to fail. (PSR, PageID 1059, ¶ 33). Mr. Garbin and his co-conspirators eventually coalesced around the idea of taking on the person responsible for the shutdown: the Governor.

Exactly what they were going to do at first was not clear, although the group seemed to agree that doing something at the Governor's vacation property presented a much softer, and thus more suitable, target than the Capitol. Mr. Garbin even talked about shooting up her vacation house, even if the only point was destroy her property. (PSR, PageID 1059, ¶ 33). One co-conspirator talked about walking up to the front door and shooting her in the head. (PSR, PageID 1061, ¶ 43). Only one co-conspirator supported this idea. (*Id.*) They also talked about, and eventually agreed upon, kidnaping the Governor. As mentioned above, that is as far as the consensus reached. There was no agreement about what to do once they kidnapped her.

None of this is meant to suggest that this is not a serious crime. It is. Mr. Garbin understands that he crossed over a crucial legal line in the sand when he and his co-conspirators actually began

taking actions to make the plot possible, such as conducting physical surveillance on the Governor's vacation home, among other things. While it may never be known if this group, or which of the co-conspirators, would have actually followed through with the kidnaping, it is well-settled that the law does not require them to fully execute their plans or be successful in their endeavors in order to be found guilty of conspiring to break the law. Mr. Garbin clearly crossed the line from engaging in constitutionally protected speech, protests, and bearing arms, to committing a serious federal crime when he committed an overt act in furtherance of the kidnaping plot by participating in the physical surveillance of the Governor's vacation house.

Prior to crossing that fateful line, Mr. Garbin struggled with two narratives, either of which he was still free to employ on any given day: he could tell himself that he was "all-in" and a real patriot who was going to actually do something about the government shutdown rather than just complain about it (*see,* e.g., PSR, PageID 1063, ¶ 49) or, he could tell himself that he had not actually done anything illegal yet because airing one's grievances, protesting at the Capitol, and engaging in tactical firearms training are all constitutionally protected activities. (*See,* e.g., PSR, PageID 1061, ¶ 39, (a co-conspirator asked several members of the group "Ok, well how's everyone feeling about kidnapping?" and no one responded, including Mr. Garbin); PSR, PageID 1062, ¶ 48 (Mr. Garbin was invited to the first surveillance of the Governor's house but declined to participate.) Mr. Garbin vacillated between being willing to do something, albeit extreme, about the government shutdowns and wanting to extricate himself from the dark and troubling plot in which he found himself immersed. To this day, Mr. Garbin cannot say for certain whether he would have followed through with the plot or not. Fortunately, it was foiled and nobody was hurt.

### Extraordinary Acceptance of Responsibility and Cooperation

Mr. Garbin knows he crossed a life-altering line and that what he did was wrong. When confronted with this reality and the wrongfulness of his actions, first by his arrest and later as the legal process unfolded, he "manned up," accepted responsibility for his actions, and then set about doing everything in his power to make amends for his actions.

First, he pled guilty to the kidnaping conspiracy. He did not wait to see if there was any way to wriggle out of accepting responsibility for his actions. He even did so before his attorneys had been provided with all of the Rule 16 discovery, in part, because he knew what he did was wrong regardless of what happened in the discovery process.

Second, he started making amends for what he plotted to do to the government and, in particular, its Governor, by cooperating fully with the government. His cooperation includes providing the government with its only first-hand, insider account, to date, about his role in the plot as well as his co-conspirators. His cooperation is helping the government prove the grim reality that, no matter how ill-conceived the plot may have been, he and his co-conspirators took very real steps to help make it happen. This is a very tangible demonstration of Mr. Garbin's commitment to making amends, which puts his personal safety at great risk, particularly in prison.

### Post-Offense Rehabilitation and Need for Most Effective Treatment

Third, he has taken this last year of confinement to engage in a lot soul-searching and introspection to understand how he went from a hardworking, law-abiding aviation mechanic to becoming enmeshed in an extremist plot to kidnap the Governor. Doctor Abramsky's report and Parents for Peace analyses are illuminating in this regard. (*See* Attachments A - C). Not only do they provide a very credible and incisive explanation about how and why Mr. Garbin traveled

down this path with such extremists, they also provide a roadmap for recovery that has proven to be successful.

Lastly, Mr. Garbin has already begun part of his post-offense rehabilitation. As the video and letter from Parents for Peace indicate, Mr. Garbin has engaged in deradicalization counseling and is "an ideal candidate" for successful rehabilitation. (Attachment A - Video at 21:15). Once Mr. Garbin has completed this counseling, Parents for Peace has identified Mr. Garbin as an "invaluable asset to the United States" in helping curb extremism in the United States by reaching out and counseling others. (Attachment A - Video).

<u>History and Characteristics, Deterrence, Protection of the Public from Further Crimes</u>

In addition to the above, Mr. Garbin's Sentencing Mitigation Video provides ample reason to believe that a sentence well below the advisory guideline range is sufficient to accomplish the goals of sentencing. Mr. Garbin has proven that he is capable of being a law-abiding citizen and this is his first brush with the law. As such, he is statistically less likely to reoffend, especially since he has accepted responsibility for his actions in an extraordinary way. (*See* Sentencing Commission's report, Recidivism and the "First Offender" (May 2004), available at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf, which notes that:

> The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all.

(*See also* Motion for Variance and Brief in Support). He is motivated to be productive member of society and was gainfully employed full-time as an aviation mechanic until his arrest. (PSR, PageID 1076, ¶¶ 130-133). He is clearly talented in this regard, as the letters of support make

7

clear, and has the potential to make a tremendous impact in the United States by working with Parents for Peace and curbing extremism. The physical and verbal abuse he endured from his biological father, which contributed to his involvement in this case, is readily addressed now that it has finally been properly diagnosed and treatment is available. Lastly, he enjoys the full support of his loving family, which is full of pro-social people, to help keep him on track. (*See* Attachments D - S).

### III.   CONCLUSION

Based on the above, Mr. Garbin respectfully submits a sentence well below the Guidelines, with a period of supervised release, is a sufficient sentence to accomplish the goals of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

Dated: 08/18/2020

*/s/ Gary K. Springstead*
Gary K. Springstead (P59726)
SPRINGSTEAD BARTISH BORGULA & LYNCH, PLLC
Attorneys for the Defendant, Mr. Garbin
60 Monroe Center St., NW #500
Grand Rapids, MI 49503
(231) 924-8700
gary@sbbllaw.com