UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

CASE NO.: 1:20-CR-183-3

v.

HON. ROBERT J. JONKER

TY GERARD GARBIN,

    Defendant.

---

**DEFENDANT TY GARBIN MOTION FOR A VARIANCE UNDER 18 USC § 3553**

---

**I.  A downward variance is warranted because Mr. Garbin has demonstrated extraordinary acceptance of responsibility for his actions, *viz.*, immediately cooperating with the government at the time of his arrest, pleading guilty relatively soon after arrest, and being the first and only defendant to plead guilty and cooperate with the government thus far. [3553(a)(1) factors – history and characteristics of the defendant].**

As the Government highlights in its sentencing memorandum and motion for a downward departure, Mr. Garbin has demonstrated extraordinary acceptance of responsibility and provided truly extraordinary assistance to the Government in this case. (*See* Government Sentencing Memorandum, ECF No 271, PageID 1526-1528; Government's Motion for a Downward Departure, ECF No. 272, PageID 1533-1535). Mr. Garbin entered a plea of guilty less than two months after he was arrested, prior to even being indicted, and before the Government provided his lawyers with Rule 16 discovery.

First, Mr. Garbin's acceptance of responsibility goes well beyond that ordinarily seen by defendants who plead guilty. This is illustrated by his plea of guilty less than two months after he was arrested, prior to even being indicted, and before the Government provided his lawyers with

Rule 16 discovery.

Post-*Booker,* extraordinary acceptance of responsibility is certainly grounds for variance from guideline range even if no longer a basis for guideline departures. *See e.g., United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (The district court properly imposed sentence of probation where the defendant was convicted of filing false income tax return, with guidelines of 10 – 16 months, in part because defendant "cooperated with authorities and accepted responsibility . . . to an extraordinary degree.");

In Mr. Garbin's case, his extraordinary acceptance of responsibility is also evident from the words of Ty Garbin himself:[1]

> **Your statement regarding the offense.**
>
> I feel that the choices I made were wrong. During the course of this offense, I let my emotions get in the way of any rational thinking that could have been made. My choices not only effected myself and family, but they also may have added to the already unstable political environment. My actions set off multiple reactions that I could have never have predicted, and for that I am not only sorry, but ashamed of myself for making such choices.
>
> \* \* \*
>
> I feel my safety, and family's safety will be compromised for a long time. I feel that the victims of this conspiracy will have to worry about their safety as well.
>
> \* \* \*
>
> I am ashamed of my actions, and the outcome of my actions.
>
> \* \* \*
>
> **Is there anything else you would like the Judge to know about you that has not already been discussed?**
>
> Just that I am truly sorry for everything that has happened as a result of my offense.

---

1 Presentence Report, ¶ 83, pp 23 – 24.

Mr. Garbin then engaged in period of active cooperation with the Government that could only be described as extraordinary – he gave at least three detailed proffers, answered numerous follow up questions, and has already testified twice before a Grand Jury. He was repeatedly honest and forthright, and acknowledged his participation and wrongdoing. Finally, he has signed Plea and Cooperation agreements that require him to testify against any Co-defendants that proceed to trial.

Given that Mr. Garbin has provided the Government with the only insider account of what transpired and has been and remains a key witness for the government in a case that has garnered the nation's attention, Mr. Garbin' cooperation has been beyond substantial and is more fairly described as extraordinary. It is difficult to find comparable example of such cooperation in a case of similar national importance.

Yet, the Government has only requested its standard four-level departure for a person who has testified in the grand jury, as if this were any run-of-the-mill federal case. Surely, the danger that Mr. Garbin has placed himself in, and quite possibly his family, by cooperating cannot be understated. In fact, Counsel for Mr. Garbin has already received a death threat related to Mr. Garbin's case that the FBI is investigating and Counsel is not even close to the target that Mr. Garbin presents for extremists, prison gangs, or someone out to make a name for themself. The danger is real and will pervade everything Mr. Garbin does and goes, and the Government acknowledges as much in their Motion for Departure. (Government Motion for Downward Departure, ECF No. 272, PageID 1535). Even so, the Government robotically requests the same four-levels it would if a person were to testify in the grand jury in an environmental crimes prosecution.

This Court is not required to simply rubberstamp the Government's recommendations. It has the authority to either grant either a more significant guideline departure under § 5K1.1 or a downward variance based on Mr. Garbin' substantial cooperation, which can properly be considered under 18 U.S.C. § 3553(a)(1) (history and characteristics of the defendant), because Mr. Garbin's cooperation also reflects a reduced likelihood of recidivism and is a beneficial part of defendant's history and character. *See e.g., United States v. Fernandez*, 443 F.3d 19 (2nd Cir. 2006) ("We agree that in formulating a reasonable sentence a sentencing judge must consider "the history and characteristics of the defendant" . . . and should take under advisement... the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure").[2] Finally, Mr. Garbin' sentence must reflect an individualized evaluation of the value and level of his cooperation[3] – which has been substantial.

**II.      Because the Guidelines fail to account for the fact that Mr. Garbin is going to be particularly vulnerable to abuse in prison, given the nature of his cooperation and his diminutive frame and, therefore, subject to a more restrictive confinement, he will be unable to enroll in several BOP programs that would otherwise shorten his incarceration, the Court should grant him a downward variance.**

In fashioning a sentence tailored to Mr. Garbin's individual traits and case, Mr. Garbin's cooperation and diminutive frame is particularly vulnerable to abuse in prison. He has already endured physical altercations and abuse at the hands of other inmates while incarcerated. Pretrial confinement in this District involves less privileges and closer monitoring than prisons, which

---

2 *See also, United States v. Khoury*, 62 F.3d 1138 (9th Cir. 1995) (court may depart downward where government refuses to make §5K1.1 motion when government initially offered to do so and where defendant's cooperation led to arrest of co-defendant); *United States v. Treleaven*, 35 F.3d 458 (9th Cir. 1994).

3  *United States v. King*, 53 F.3d 589, 590-92 (3d Cir. 1995) (When departing downward, court must evaluate Defendant's cooperation on an individualized basis, and cannot engage in mechanical reduction).

4

makes it likely that his danger will be higher in a federal prison. In addition, Mr. Garbin's cooperation is likely to paint a target on his back for prison gangs and other inmates – particularly if he is sent to a USP.

Therefore, Mr. Garbin will likely need to be housed in protective custody and face a far more restrictive environment than the average inmate. He will likely have less access to rehabilitative programming and endure a far more punitive sentence than other inmates. For example, there is a very real chance that Mr. Garbin will be ineligible for the BOP's drug treatment, 500-hour drug program, home detention, intermittent incarceration, minimum security designation, and community confinement programs that are otherwise available to the general prison population. As such, Mr. Garbin will likely end up serving a longer period of incarceration, in a more restrictive setting than he would if he did not cooperate in this case and was not so small in stature. Good public policy augers in favor of reward pleading guilty and cooperating in a federal case rather than disincentivizing it.

Several courts have held that a Judge may depart from the guidelines in order to enable a defendant to be eligible for a program, such as boot camp, counseling, or other rehabilitative program.[4] If a court can depart from the guidelines in order to give a defendant boot camp or the drug program, then there is no reason why this Court cannot do so to keep him safe by avoiding a USP, or because he is ineligible for substantive programing such as RDAP.

---

4  United States v. Jones, 158 F.3d 492 (10th Cir. 1998); United States v. Martin, 827 F.Supp. 232 (S.D.N.Y. 1993) (district court departed downward to enable defendant to be eligible for boot camp); cf. United States v. Duran, 37 F.3d 557, 560-61 & n. 3 (9th Cir. 1994) (receive fullest possible benefit under prison drug abuse program).

### III. Mr. Garbin's completely clean criminal record is deserving of a variance because this is his first arrest and conviction.

Mr. Garbin is a true first-time offender, with no prior criminal history – even for arrests. He has lived an entirely responsible life, becoming a productive and responsible adult in his early 20's – finishing trade school, becoming certified as an airplane mechanic, employed as an airline mechanic, working hard, owing home/property, and being a productive member of his family and the community – all before the age of 25. Mr. Garbin enjoins the strong support of both family and friends,[5] and these charges certainly represent aberrant behavior. The attached letters of support paint the picture of an extraordinary young man – loyal, devoted, and successful. There is no evidence Mr. Garbin ever previously engaged in any criminal activity, let alone something as serious as his instant count of conviction.

While a lack of criminal history is *de facto* taken into account (to some extent) by the guidelines, there is a significant difference between a person with a criminal history category of I, and a person, such as Mr. Garbin, with no prior arrests or convictions at all.

To start with, 28 U.S.C. § 994(j), charges the Sentencing Commission with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]"

In *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009), the Ninth Circuit found that a district court's *sua sponte* variance to probation in a child pornography case with guidelines of 41 – 51 months was not unreasonable, in part, because defendant's first conviction "did not fully

---

5 *See* the **several** letters of support, attached as part of the attachments to Mr. Garbin's Sentencing Memorandum.

6

account for his complete lack of criminal history" since a defendant with minor criminal history may still fall in criminal history category I.

Likewise, in *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008), the Tenth Circuit upheld a variance to 24 months in a child porn case with guidelines 78 - 97 months. The court reasoned that this was defendant's first conviction, and rejected the government's argument that the guidelines already considered this by placing defendant in criminal history category I:

> . . . although the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of I... this is a not a departure case, it is a variance case.... and, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a).... Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis.

In fact, the Sentencing Commission's own research suggests that proper application of 3553(a) in the case of a "true" first offender now strongly supports a below-guideline variance because of 3553(a)(2)(C) and 3553(a)(6). As Professor Berman points out in his sentencing blog, these factors are only properly acknowledged if and when a "true" first offender gets a lower sentence than the advisory range suggested for all the other persons with some criminal history that are lumped into Criminal History Category I. *See* Sentencing Commission's report, Recidivism and the "First Offender" (May 2004), available at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf, which notes that:

> The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all.[6]

---

6 *United States v. Duane*, 533 F.3d 441 (6th Cir. 2008) ([T]he district court did not respond to Duane's first argument — that he deserved a more lenient sentence because he had zero criminal history points. This was not a particularly strong argument given that Duane's criminal history

**IV.     Dr. Abramsky's Report and Mr. Garbin's Sentencing Mitigation Video demonstrate that, because Mr. Garbin overcame years of physical and verbal abuse at the hands of his biological father to become a certified aviation mechanic at a young age, work full-time, earn good money, and use his talents and skills for a positive purpose, he is deserving of a downward variance.**

Mr. Garbin's behavior is mitigated to some extent by his extraordinarily difficult childhood and his positive accomplishments since then. As chronicled in the Presentence Report (PSR), Dr. Abramsky's Report and Mr. Garbin's Sentencing Mitigation Video, Mr. Garbin had a very difficult childhood. His father was an alcoholic, or a 'heavy drinker" as Mr. Garbin explained in the PSR. His parents fought all the time, until his mother ultimately left his father and they divorced when Mr. Garbin was around 10. Mr. Garbin attempted to avoid his father, their relationship was "strained," he was in and out of his life for about 5 years, and he has had no contact with his father in over 10 years.

Despite these difficulties, Mr. Garbin managed to overcome these obstacles and accomplish many positive achievements. He attended and completed trade school, becoming certified as an airplane mechanic. He was employed as an airline mechanic from 2015 until his arrest in October 2020. As a young adult, he was employed, worked hard, owed home/property, and was a productive member of his family and the community – all before the age of 25.

Mr. Garbin's personal background and childhood cannot be underestimated – it had a direct and undeniable effect on Mr. Garbin's involvement in this case. And it makes the path he was on as a young adult even more impressive. This Court should take this into account when sentencing Mr. Garbin.  A troubled upbringing and domestic violence as a child can be considered by this

---

category was taken into account in determining his Guidelines range.  But the argument was not completely frivolous.  Because Duane had zero points at age 57, he might plausibly argue that even category I — which applies when a defendant has zero or one criminal history point(s) — overstated his criminal history to some degree.");

Court at sentencing *United States v. Lopez*, 938 F.2d 1293, 1298 (D.C. Cir. 1991). "Children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens." *Santosky v. Kramer*, 455 U.S. 745, 789 (1982); *see U.S. v. Deigert*, 916 F.2d 916, 918-19 (4th Cir. 1990); *see Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (Rehnquist, J., dissenting )(evidence about the defendant's background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse.")[7]

V. **Mr. Garbin was particularly vulnerable to becoming involved in extremism, which mitigates to some extent his participation in the instant offense.**

Because, based on the physical and verbal abuse Mr. Garbin endured in his formative years, he was more likely to engage in extremism to mask his true feelings of vulnerability and fear, Mr. Garbin is, to an extent, less morally blameworthy than a defendant free from such abuse. Dr. Abramsky's Report, the Report from Parents for Peace, and the Sentencing Mitigation Video are compelling evidence of this psychological phenomenon. Therefore, some adjustment is necessary to Mr. Garbin's sentence to account for this particular circumstance in Mr. Garbin's life.

VI. **The fact that Mr. Garbin has already engaged in and is committed to completing deradicalization treatment with Parents for Peace and eager to help deradicalize others involved in extremism at the conclusion of this case is evidence of extraordinary post-offense rehabilitation.**

Mr. Garbin not only got involved in a kidnaping plot that has garnered national attention,

---

7 Note: while the Guidelines eliminated this ground in §5K2.0 (d)(1), *Booker* has given it new life. *See also United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991), *overruled on other grounds*, *United States v. Atkinson*, 990 F.2d 501 (9th Cir. 1993) (affirming a departure in a drug case from a guideline range of 30 years to life to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth).

he has also taken his rehabilitation extremely seriously and engaged in some ground-breaking deradicalization treatment that holds the promise of deradicalizing others and, in so doing, reuniting this country in a way that it has been so desperately lacking. The report from Parents for Peace in this regard is nothing short of thrilling, in that a person who is undoubtedly experiencing rock bottom in their life also holds the key to dramatically transforming this country from throes of extremism back to a truly United States of America. Based on this post-offense rehabilitation, Mr. Garbin is deserving of a downward variance.

## CONCLUSION

For all of the forgoing reasons, Mr. Garbin respectfully requests that the Court sentence him to sentence well below the advisory guideline range.

Respectfully submitted,

Dated: 08/18/2020

*/s/ Gary K. Springstead*
Gary K. Springstead (P59726)
SPRINGSTEAD BARTISH BORGULA & LYNCH, PLLC
Co-Counsel for the Defendant, Mr. Garbin
60 Monroe Center St., NW #500
Grand Rapids, MI 49503
(231) 924-8700
gary@sbbllaw.com

Mark A. Satawa P47021
SATAWA LAW, PLLC
Co-Counsel for the Defendant, Mr. Garbin
26777 Central Park Blvd; Suite 300
Southfield, MI 483076
(248) 356-8320