<pre>
 1                 IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF MICHIGAN

 3                      SOUTHERN DIVISION

 4     UNITED STATES OF AMERICA,

 5          Plaintiff,                No.  1:20cr183

 6       vs.

 7     TY GERARD GARBIN,

 8          Defendant.

 9

       Before:
10
                      THE HONORABLE ROBERT J. JONKER,
11                        U.S. District Judge
                          Grand Rapids, Michigan
12                      Wednesday, August 25, 2021
                          Sentencing Proceedings
13
       APPEARANCES:
14
                      MR. ANDREW BIRGE, U.S. ATTORNEY
15                    By:  MR. NILS R. KESSLER
                      MR. AUSTIN JACOB HAKES
16                    The Law Building
                      333 Ionia Avenue, NW
17                    Grand Rapids, MI 49501-0208
                      (616) 456-2404
18
                          On behalf of the Plaintiff;
19
                      MR. GARY K. SPRINGSTEAD
20                    MS. NICOLE SPRINGSTEAD-STOTE
                      Springstead & Bartish Law PLLC
21                    20 West Main Street
                      Fremont, MI 49412
22                    (231) 924-8700

23

24

25
</pre>

1

                    MR. MARK A. SATAWA
                    Satawa Law PLLC
2                   26777 Central Park Boulevard, Suite 300
                    Southfield, MI 48076-4172
3
                              On behalf of the Defendant.
4

5        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    08/25/2021

2    (Proceedings, 4:00 p.m.)

3    THE CLERK:  The United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Robert J. Jonker, chief judge, presiding.

6    THE COURT:  All right.  We're here on the case of the

7    United States against Ty Garbin.  It's the time set for

8    sentencing, and we'll start with appearances.  If you are in

9    the front and have a speaking role today I certainly don't

10    expect you to wear masks, and so let's begin with appearances

11    and we'll go from there.

12    MR. KESSLER:  Good afternoon, Your Honor.  Nils

13    Kessler and Austin Hakes for the United States.

14    THE COURT:  All right.

15    MR. SPRINGSTEAD:  Good afternoon, Your Honor.  Gary

16    Springstead and Mark Satawa on behalf of Ty Garbin.  Seated

17    behind us is Nicole Springstead.

18    THE COURT:  Okay.  Very good.  Welcome everyone.  Let

19    me make sure I have received everything that the parties wanted

20    me to see in advance of the sentencing.  Of course, we have the

21    presence report from our probation officer.  I do have a

22    Government sentencing memorandum and its motion for downward

23    departure.  I have a defense sentencing memo and a motion and

24    brief on the variance issues.  There are exhibits as well to

25    those items.  And then I have a proposed preliminary order of

1　forfeiture that I think tracks what's in the plea agreement,

2　but I did want to confirm that before we go too far.  I think

3　that's it.  Anything else I should have from the Government in

4　written form?

5　　　　　　　MR. KESSLER:  No, Your Honor.

6　　　　　　　THE COURT:  Defense?

7　　　　　　　MR. SPRINGSTEAD:  No, Your Honor.

8　　　　　　　THE COURT:  Okay.  On the preliminary order of

9　forfeiture, Mr. Springstead or Mr. Satawa, is the Defense

10　satisfied that that's accurate and should enter.

11　　　　　　　MR. SATAWA:  It is, Your Honor.  Thank you.

12　　　　　　　THE COURT:  I'll go ahead and do that as part of the

13　filing today.

14　　　　　　　Moving to the plea agreement.  This case did come with

15　a plea agreement.  It did call for Mr. Garbin's plea to the

16　only charge against him in the indictment, but included also a

17　promise not to bring other charges.  So it does need the Courts

18　imprimatur, and I am satisfied under 6B1.2 of the guidelines

19　and related authority that it's an appropriate resolution of

20　the case and honors the purposes of sentencing, so I am

21　accepting that.

22　　　　　　　Moving to the guidelines, then, is the next issue.

23　The base level here is 32 based on the offense of conviction.

24　Six levels are added under Chapter 3 because the victim here is

25　an official victim, Governor Gretchen Whitmer.  That takes us

1    to 38.  I do think acceptance of responsibility is appropriate.

2    I am granting those two points, and is the Government moving

3    for the third?

4            MR. KESSLER:  We are, Your Honor.

5            THE COURT:  I'll grant that, taking us to level 35.

6    The criminal history category is I, so the guideline range off

7    the chart before considerations of departure and variance would

8    be 168 to 210 months.  Any guideline objections from the

9    Government?

10           MR. KESSLER:  No, Your Honor.

11           THE COURT:  Or the Defense?

12           MR. SATAWA:  No, Your Honor.

13           THE COURT:  Okay.  Then let's get to the meat of the

14   discussion, which is starting with that guideline range what's

15   sufficient but not greater than necessary all things considered

16   to appropriately reflect the § 3553 factors and other

17   sentencing considerations?  I usually start that with the

18   Defense, and I plan to do that here, too.  So either

19   Mr. Satawa, Mr. Springstead, whoever is going to speak I'll

20   invite you.  Why don't you take the podium so you are closer to

21   a microphone that will allow everybody to hear clearly.  Thank

22   you.

23           MR. KESSLER:  Your Honor, were you planning to address

24   the 5K motion later?

25           THE COURT:  Yes.

1          MR. KESSLER:  I only ask because it does affect the

2     guidelines.

3          THE COURT:  In fact, as far as the Defense is

4     concerned, too, if you want to make your comments now on the

5     departure motion feel free.  I am just looking for the

6     sentencing package from each side and then I'll make my

7     rulings.

8          MR. SATAWA:  Your Honor, to be honest, Mr. Springstead

9     and I -- division of labor.  Mr. Springstead was going to

10    address the 5K --

11         THE COURT:  All right.

12         MR. SATAWA:  -- if you want us to do that.  He can

13    speak first.

14         THE COURT:  Either order is fine to me.  You decide

15    what you like to do first.

16         MR. SATAWA:  Your Honor, if it please this Court,

17    the -- it's so often focused when we get to sentencing on the

18    conduct -- and of course, the nine months of Mr. Garbin's life

19    that ended in October of 2020 is mandated on this Court under

20    3553's nature and characteristics of the offense to be taken

21    into account by Your Honor in fashioning the sentence, and that

22    conduct has disturbing facts and allegations as this Court well

23    knows.

24         The presentation of the Defense, Your Honor, is to ask

25    this Court instead of just focusing on this, which I know this

Court will not do, to look at the 24 years of Mr. Garbin's life prior to the beginning of the 2020 calendar year and as well as the 10 months that Mr. Garbin has gone through since being arrested for this offense.

Your Honor, the focus of the Defense presentation is in an effort to show under 3553 not just the character and history and characteristics of Mr. Garbin, but to address those other factors as well: Deterrence, punishment, et cetera. And the question is how does this society react to a person who not only commits this offense but the way the person reacts to it following the offense becomes a critically important question to answer as relates to the 3553 factors.

I would submit, Your Honor, that Dr. Abramsky and Parents for Peace do an excellent job of addressing Ty Garbin's personal background that leads to his maturation into an adult. I think it's important to note that Ty Garbin overcame significant abuse in his own home, physical, psychological, emotional and mental abuse by his own biological father that he witnessed not just on himself but on his sisters, his younger sisters, his two younger sisters and his mother. He overcame that, went to trade school, became a certified mechanic, and was thriving as a very, very young man in his early 20's.

Along comes COVID. He is cut back on hours and he is psychologically predisposed to finding himself in a position of becoming swept up in a group such as that charged in the

current indictment.

Mr. Garbin does not offer this as an excuse, Your Honor.  Mr. Garbin offers this because as Dr. Abramsky and Parents for Peace do a far better job of explaining the unique psychological background.  Unique to Mr. Garbin as well as unique to radicalization, radical groups such as that which was charged in this indictment.

Mr. Garbin does not excuse or justify his actions in this case.  I think the comments found in the presentence report, as well as the comments from Parents for Peace, Dr. Abramsky, and his family, all scream that he does not do that.  In fact, Your Honor, the second part of my presentation, the time after being arrested, is what truly in the minds of the Defense sets this case apart.

Mr. Garbin was arrested.  I think the Government even references in its sentencing memorandum, frequently the Government will say, the Defense will say, well, we can't analyze the case and let you know whether or client is interested in pleading guilty or cooperating until we have a chance to review Rule 16 discovery, and as the Government sort of rhetorically asks, well, you know, ask your client.  He knows what he did.  Does he need Rule 16 discovery?  He knows what he did.  Did he commit the crime and is he willing to accept responsibility?

Ty Garbin didn't just do that, Your Honor.  Ty Garbin,

less than 60 days after the conclusion of his preliminary examination, as pointed out by the Government, was standing in front of this Court pleading guilty and had agreed -- he may not have pled guilty at that point, Your Honor, but he had agreed to plead guilty and cooperate.

He has an uber-acceptance of responsibility.  He made these decisions -- when Mr. Springstead and I were still going over initial discovery and analysis of the case issues, he made this decision prior to the Government satisfying its Rule 16 discovery obligation.  He did that because he came to us and said, what I did was wrong and I have to correct it, and he did.  He agreed to give the Government proffers, which he has done at least three times.  He has agreed to testify, which he has done at least twice.

The Government does an excellent job of filling in the blanks in terms of the value of that assistance.  And he did that again, Your Honor, before the issuance of Rule 16 discovery.  And I think it's important to note that Ty Garbin testified in front of the grand jury in support of the very indictment that got him indicted.  He has fully, completely and universally accepted responsibility for what he did.  He is truly, genuinely, and sincerely sorry.  He is not just committed to himself, to make up for what he did to himself or to his family, but to others as reflected by what Parents for Peace has said both in their written report and in the

1  mitigation video presented by the defense, which is to say, Ty

2  Garbin is 100 percent committed to trying to help others from

3  going down the path he found himself going down.

4          When Your Honor looks at not just that nine-month

5  period during the commission of the offense, but his background

6  beforehand and his actions after, we would submit under Rule

7  3553 -- I'm sorry, not rule.  Under USC 3553(a), Your Honor --

8  and I apologize -- that these factors create a situation where

9  a sentence that is sufficient and not greater than necessary --

10  and I will leave the comments as to why this as to

11  Mr. Springstead.  As I said, Your Honor, we respect the

12  Government's recommendation of a nine-year sentence at the

13  bottom of the amended guideline range after the departure

14  motion.  The Defense would respectfully request that a sentence

15  that is sufficient but not greater than necessary for all of

16  these reasons, as well as the reasons contained in all of the

17  filings Dr. Abramsky, Parents for Peace, the support letters

18  and the video, that the sentence that is sufficient but not

19  greater than necessary is six years, 72 months.  Thank you.

20          THE COURT:  All right.  Thank you, Mr. Satawa.  And

21  we'll go to Mr. Springstead.

22          MR. SPRINGSTEAD:  Thank you, Your Honor.

23          As Mr. Satawa already indicated, the Government has

24  done a good job of delineating exactly what Ty has done, the

25  dangers that he has posed to himself, and not surprisingly

they've recommended a four-level downward departure based
primarily on his testimony before the grand jury.  And of
course, that's all in a framework of trying to come up with a
scale that's uniform for the district so there is not anomalous
departures depending on which AUSA or Defendant is on the case,
and so that kind of quantitative effort I totally understand
and I think that their four-level request is reasonable.

The only exception that I would take with that are
three points.  No. 1, there is a qualitative difference in Ty's
cooperation than any of your routine run-of-the-mill testimony
before the grand jury.  This is a case of national interest.
Of course, it's even more the State of Michigan is all very
interested in this case and what happens to these people who
posed a threat to the Governor.  And Ty so far is the only
person to come forward, plead guilty, and cooperate.  He is
there telling the insider account of what happened during this
conspiracy at times that weren't covered by cooperating
witnesses, recordings or undercover recordings, and I don't
think that that cooperation can be understated in a case like
this.  He is going to be a star witness.  He by all accounts
has been truthful, honest, and totally cooperative with the
Government.  So I think that there is a qualitative difference
between their quantitative analysis that they typically use.

Second, I am not sure that the four-level departure
incorporates any type of danger analysis, and 5K does list that

1    as one of the factors, the danger that one has placed themself

2    in through cooperation, including his family.

3         Of course, Ty has, as the Government said, put a

4    target on his back by cooperating, particularly against an

5    extremist group and all of the adherents out there that may

6    want to make a name for themselves or truly object to him

7    working with the Government and telling the Government actually

8    what happened.

9         So I don't think that the Government's motion takes

10   that into account.  I think if there was -- as I said in my

11   motion, if this were a white collar case with no danger to it

12   and the person testified in the grand jury, I would fully

13   expect that they would move for the same exact level departure.

14        And then lastly, the Government -- their quantitative

15   analysis rates the point system based on how they rank the

16   importance of their cooperation, which, you know, that's their

17   purview, but they happen to rate trial testimony as the highest

18   level of cooperation that someone can get, and of course, we

19   anticipate and the Government anticipates that Ty is going to

20   testify at trial.

21        That being the case, that's not -- that's not a

22   guarantee that he is actually going to get that opportunity to

23   testify at trial.  He may very well -- at the end of the day

24   all the Defendants might plead or there might be something else

25   that happens where he is not presented with that opportunity to

1    testify at trial, and that cooperation, if he induces them to

2    plead, would be just as valuable as if they -- as if he had

3    testified at trial except he'd save them a tremendous amount of

4    resources and time in his cooperation.

5         So for those reasons, Your Honor, we're moving for an

6    additional departure under 5K that would take Ty down to, in

7    combination with the variance motion, to the six years that

8    Mr. Satawa requested.

9         THE COURT:  All right.  Thank you, Mr. Springstead.

10        And Mr. Garbin, you have the privilege of speaking,

11   too.  You don't have to.  It's an opportunity, not an

12   obligation.  I have certainly read the materials that your

13   lawyers sent in from you.  I heard from you on the video as

14   well.  But if there is something you want to say here in the

15   sentencing process directly to me, please do.  And I'll bet

16   your lawyer can help you get that microphone close so that you

17   don't have to move from your seat.  You can just stay right

18   there and I'll be glad to listen.  Go ahead.

19        THE DEFENDANT:  Your Honor, first I would like to take

20   this opportunity to apologize to Governor Gretchen Whitmer and

21   her family.  I have had a lot of time to reflect on my actions,

22   and I never realized what my actions would have caused to her,

23   but also her family.  I can't even begin to imagine the amount

24   of stress and fear her family members felt because of my

25   actions, and for that I am truly sorry.

1    I'd also like to take this opportunity to apologize to

2    my family and friends, Your Honor.  I never took into

3    consideration the emotional effect that my actions would take

4    on them as well, and for that I was truly selfish to not take

5    into consideration my family members that have meant so much to

6    me.

7    Going forward, Your Honor, I would like to continue to

8    work with Parents for Peace, not just to deradicalize myself

9    and build myself into a better person, but to help others from

10   becoming radicalized and help them from making the decisions

11   that I have made and bring some change and some good to the

12   environment.  And that's all I have, Your Honor.

13   THE COURT:  All right.  Thank you.

14   We can go to the Government, Mr. Kessler.

15   MR. KESSLER:  Thank you, Your Honor.

16   I'll just begin by addressing the 5K motion, and I'll

17   just phrase this in terms of the five characteristics that §

18   5K1.1 lays out.  First as to the significance of the

19   cooperation.  It's hard to over state how significant

20   Mr. Garbin's cooperation was here.  He filled in a lot of gaps

21   for us.

22   As the Court can imagine there is a lot of recordings

23   out there of things that confidential informants or undercover

24   agents were able to record, and there were a lot of

25   considerations and things that happened that don't get captured

1    on a tape device, and Mr. Garbin was there for a lot of those

2    and was able to fill in those gaps, for example.  Times where

3    he talked with other Defendants where no undercover was there.

4         We also -- we had a lot of evidence of intent that was

5    circumstantial evidence but having Mr. Garbin come in and tell

6    the insider's version of the story has been critical.  Probably

7    more than anything else having somebody who was part of this

8    agreement say, this wasn't just big talk.  We really meant to

9    do it is a huge thing and it's going to be important to the

10   jury when he testifies.

11        As far as the truthfulness of the information he's

12   given us, as I mention in our sentencing memo it's all been

13   corroborated by external evidence.  And I noticed this in

14   questioning him during his testimony that he never really

15   minimized his conduct at all, and it's one of the reasons that

16   kind of thing is admissible as an exception to the hearsay rule

17   is that admissions against interest tend to be correct.  He

18   didn't hold back.  He would come right out and say, we planned

19   to do this and I was knowingly a part of it.

20        As far as the nature and extent of the cooperation he

21   has given us, I won't belabor the point.  Mr. Satawa made it.

22   He's testified twice.  He's given us multiple debriefings and

23   he's sat for hours answering all of our questions.

24        As far as the risk, I would just -- I think this is a

25   good time to just address what Mr. Springstead was saying.

He's correct that Mr. Garbin has put a target on his back, not only retaliation from the other defendants, but potentially their ideological sympathizers in prison or people who want to be famous for, you know, taking on somebody who is -- was high profile in a national case.  I do think, for what it's worth, that this is not necessarily the time to fully reward that.  As Mr. Springstead said, he's going to be a star witness we assume.  You know, we fully expect him to testify at the trial.  I don't think it's realistic that all of them are going to plead, but even if they did, Rule 35 would allow us to address that then.  He is not really facing that much danger right now prior to trial because he has been segregated in a different place than the rest of the Defendants.  I think where the danger really comes in is when he gets designated to a Bureau of Prisons facility and I think that would be the time we do anticipate if he testifies like he has been filing a Rule 35 motion and we could address it then.

        And then finally, as far as the timeliness of his assistance, as Defense counsel have pointed out it was before the indictment, before discovery, and it did allow us to proceed to the grand jury to obtain this indictment with confidence, and he also gave us information that we needed to file a superseding indictment with even more serious charges early on in the process so we weren't having to push back the trial date.

1    As far as the 3553 -- did you want to hear anything

2    else about 5K, Your Honor?

3    THE COURT:  Anything you have, but I don't have any

4    other questions.

5    MR. KESSLER:  That's all, Your Honor.

6    THE COURT:  Thank you.

7    MR. KESSLER:  Thank you.

8    As far as the sentencing overall and the 3553 factors,

9    I agree the Court does need to consider both the crime and the

10   offender, and we think on the basis of the crime itself a

11   guideline sentence is appropriate.  And on the basis of some of

12   the mitigating factors about the Defendant, we think a low end

13   sentence within that guideline range is appropriate as well.

14   I think three of the factors are probably the most

15   important.  First, the characteristics of the offender.  I

16   won't belabor this either because Defense counsel did an

17   eloquent job of doing it and I thought their video was also

18   pretty moving in that sense.  One thing I'd note is the fact

19   that he has no criminal history.  It's great.  I think we're

20   going to see that more and more, though, with people who are

21   involved in these militia extremist type of cases because

22   otherwise they couldn't get guns.  But I would agree with

23   Defense counsel that --

24   THE COURT:  They couldn't legally get guns.

25   MR. KESSLER:  Not legally.  That's right.  You know, I

would agree with Defense counsel that this is not just a case of somebody who doesn't have -- has old convictions that don't score or something like that.  He has never been in trouble before and that's different.

It did make me wonder when you see this, why would a productive citizen with a good job like being an aircraft mechanic who is otherwise law abiding get involved in something like this?  And there is just a huge system of disinformation swirling around out there, and I understand their point that people sometimes feel like they have a lack of control. Anybody who worked for the Government when we stopped getting paychecks for no reason or anyone who has ever worked in a factory and been laid off through no fault of their own understands that frustration and wanting to do something to take some control over it.  I would distinguish him from some other people involved in this conspiracy because I think there are purveyors of that disinformation and there are consumers. I would put Ty Garbin more on the consumer camp as opposed to someone like Mr. Croft who was actively selling an antigovernment ideology to everybody else.

As far as the seriousness of the offense, that's hard to overstate here.  The underlying object of the conspiracy to kidnap the sitting Governor of a state is about as serious as it can possibly get.  And it's not just a thought crime here. I know there is, you know, a temptation to look at something

like a conspiracy that's an inchoate defense as a thought crime
where you're just talking about it, thinking about doing it,
but they weren't just sitting around talking about it.  And I
know some of the other Defendants that filed motions that
suggest that what they were up to was protected by the First
Amendment, for example.  But they weren't just sitting around
talking about doing it.  They were practicing with
semiautomatic assault weapons.  They made real bombs that
exploded, and they were doing both daytime and nighttime
surveillances of the Governor's house.

And I think we need to -- just to see how serious it
is you need to take the Governor's position, her elected
position out of the equation for a moment and just imagine
ourselves, anyone in here or someone we love, that they are
sitting at home and somebody who has it out for them literally
has -- is training with guns and explosives and is sitting
outside their house in the middle of the night having driven
across the country to do it, just how scary that is that people
would go that far and how many lines that crosses.

One of the things I pointed out in the sentencing memo
and I'd just like to emphasize this is why I cited that Supreme
Court case, the Callanan case, is just how dangerous this kind
of a conspiracy can be, and it's not just because they might
succeed in kidnapping the Governor.  It's because of all the
other bad things that could happen in a case like this.  When

1   you get a bunch of people like this together who might not

2   otherwise be that extreme but for the fact that they were

3   altogether, egging each on, whipping each other up and coming

4   up with crazy ideas.

5           And those ideas kept changing.  As the Court is going

6   to hear and has seen from the PSR, and you are going to see in

7   the trial, they started out with ideas like raiding the State

8   Capitol, and then when they decided that was too hard to do

9   they shifted and it was maybe we'll take Governor Whitmer from

10  the official summer residence on Mackinaw Island, and then they

11  changed it to her house, the one that they were actually casing

12  at night.

13          And they kept changing that.  And at any time there

14  was the danger that somebody would see an opportunity to do

15  something crazy and they'd all whip each other up into a frenzy

16  and go do it, or they might react to something they didn't

17  anticipate.  For example, one of the things the Court will see

18  at the trial is a video of Adam Fox sitting in the Vac Shack,

19  the place where he worked at night, and police were there on

20  South Division for some unrelated reason, and there is actually

21  a video of it, and he is sitting in there telling the rest of

22  them, they are here for me.  They know about it basically.

23  They are here for me, and I have my AR-15 and I am ready to

24  start shooting.  Had nothing to do with him, but that just

25  gives you an idea of how serious it is when these people are

1  convinced that the Government is coming for them and that they

2  have to act.

3         As I also mentioned, you know, this could have

4  happened on any other number of occasions when they were

5  driving around with bomb components or illegal weapons.  Some

6  poor unsuspecting deputy sheriff could have pulled them over

7  for speeding and you could end up with that person getting

8  killed.  All of those are things that are risks of this

9  conspiracy whether or not they ever could have pulled off the

10  actual kidnapping of the Governor.

11         Finally, I think -- and one of the most important

12  things that we need to look at here is deterrence.  I am not

13  sure that specific deterrence is the biggest consideration in

14  this case.  I think Ty Garbin probably has learned a lesson

15  from this, but general deterrence is critical in this kind of

16  case.  You can't turn on the TV any night or read the newspaper

17  without seeing two or three more instances of people doing

18  stuff like this, militia involved type of people,

19  antigovernment extremists, and they are being whipped up by

20  people who are on television, they are on the Internet,

21  politicians, current and former, who want to whip up this kind

22  of sentiment for their own reasons, for their own profit.  And

23  there are people who are going to be receptive to this message.

24         Now, I think there are people who are naturally

25  receptive to it, and you'll hear in the trial there are some

1    people who heard about all this who associated with them who at

2    some point pulled the plug and said, whoa, this is getting out

3    of hand, I am not going to jail over this, and left the

4    conspiracy.

5           Then there are people like Ty Garbin who by his own

6    admission as you saw in the video was on the bubble.  Saw red

7    flags.  Knew in his brain that what he was doing was wrong but

8    in his heart maybe just stuck around longer than he should

9    have.  There are going to be people for whom the decision

10   whether to leave and say, I am not doing this, or stay in the

11   bubble is influenced by knowing what happens in a case like

12   this.  And if they see that there are serious consequences for

13   doing something like conspiring to kidnap a Governor or in the

14   Washington case, you know, conspiring to try and overturn an

15   election, that may make a difference in their decision process.

16          So I think we need to send a general deterrent message

17   to everyone with this sentence that you need to think for

18   yourself.  That's why I think given all those factors a

19   guideline sentence is appropriate, but because of Mr. Garbin's

20   individual circumstances I think a sentence at the low end is

21   appropriate.

22          THE COURT:  All right.  Thank you.

23          Is anybody planning to speak on behalf of the victim?

24   I have read the impact statement in the PSR, but of course,

25   somebody would have an opportunity to speak if they wanted to.

1          MR. KESSLER:  Not that we have been made aware of,

2     Your Honor.

3          THE COURT:  All right.  Anything else from the Defense

4     perspective?

5          MR. SPRINGSTEAD:  No, Your Honor.  Thank you.

6          THE COURT:  Okay.  And speaking again of the victim, I

7     didn't see a request for restitution.  It's a mandatory

8     restitution offense but there is no request, is that right?

9          MR. KESSLER:  That's correct.

10         THE COURT:  Thank you to all the participants here

11    today, the presentence officer and the lawyers who put together

12    really a lot of materials, and I think today's presentation

13    highlighted the key nuggets on both sides which I would expect

14    from good lawyers, and I am glad you gave it to me in advance

15    so I had time to think and reflect on it because every

16    sentencing is difficult and this one has its own difficulties.

17              It's a fairly easy one to start with because we always

18    start with guidelines and everybody agrees in this case on what

19    the guidelines are.  After you apply acceptance of

20    responsibility credit the guidelines are 168 to 210 months

21    based on a level of offense 35 and a criminal history category

22    I.  But then the question is what's sufficient but not greater

23    than necessary to achieve the overall purposes of sentencing,

24    including all the things the lawyers have talked about and all

25    the things they have written about:  The need for public

deterrence like we just heard from the Government, specific

deterrence that may or may not be necessary -- both sides have

addressed that in this case -- the need for promoting

rehabilitative opportunities to reflect the seriousness of what

did happen here, and put all of that in the mix.

The first place to start is with the Government's

motion for departure under 5K.  I recognize the basis for

departure and it's well supported not just from what the

parties have talked about here but from the written materials.

I do intend to grant that and the four levels that the

Government recommends as a reflection of the value of the

cooperation at this stage of the case.  Bringing Mr. Garbin

four levels down on the chart would suggest a guideline range

of 108 to 135 months, which is where the Government says I

should stay, albeit at the low end.

The Defense position is that either by giving more

credit for that 5K or some combination of variance factors, I

should go further down well below the guidelines in their view

from the written materials to 72 months specifically today that

we hear from the podium, and the supporting letter that they

submitted and relied upon from the Parents for Peace calls for

a minimal custodial sentence.

In my mind a minimal custodial sentence is not

appropriate here considering the seriousness of the offense and

the need for public deterrence, but I do agree that there are

factors that call for some additional variance below the bottom
of the guideline range, and in addition to the four-level 5K
that the Government filed.  And I want to talk about that and
tell the parties why I intend a custodial sentence in this case
of 75 months, which is about another four levels down.

Let me start with the seriousness of the offense and
the need for public deterrence, because those are, I think, the
factors that most strongly augur against variance.

This was a plot to kidnap somebody, and I think any
plot to kidnap, no matter who the victim is, is frightening not
just to the intended victim but to that person's family,
associates, and of course, there is danger inherent in any kind
of a plot like that no matter how far along the group gets in
actually making it happen.  And one of the statements that the
Governor makes in her victim impact statement, which is part of
the presentence report, highlights that, though she doesn't
dwell on it, but it's, of course, a factor.

When the target, though, is a sitting Governor, and
the motive is policy disagreement with the Governor's handling
of a public emergency crisis, I think the seriousness is even
worse because it really goes to the heart of what we all agree
to do together in a democratic republic.  Fierce differences of
opinion are nothing new.  They have been with us from the
foundation of the republic.  Of course, lawyers like and recall
the famous phrase of Oliver Wendell Holmes back in the 1905

1    dissent in Lochner.  The constitution is made of people of

2    fundamentally different views.

3         The key, of course, is that constitution is designed

4    to ensure that we work out our fundamentally different views

5    peacefully, not at the point of a gun, not with some other

6    blunt force threat like a kidnapping conspiracy.  Instead, we

7    are going to use those constitutional rights we all have to

8    speak, to assemble, to petition, to demonstrate, complain

9    loudly but peacefully, and ultimately to vote.  And we actually

10   saw that path followed by some citizens who didn't like the way

11   Governor Whitmer handled things either, and most notably the

12   ballot initiative that succeeded in repealing some of the

13   statutes on which she based her emergency powers.

14        That's the pathway that in a democratic republic we

15   vow to protect and use when we get spirited disagreements about

16   the way we ought to handle things.  And I think Governor

17   Whitmer's impact statement captured this, too, and I just want

18   to read a short part of it.  It's not something I need to read

19   in its entirety, but this, I think, captures exactly the point.

20   She says, "Our political system requires participation,

21   responsibility, respect for each other and compromise.

22   Violence and threats have no place in our politics.  Violence

23   harms every one of us and endangers our democracy."

24        And that is, I think, absolutely right.  I think she

25   has captured it perfectly.  And in my mind, after reviewing the

record in this case, including the facts, the very specific facts that Mr. Garbin embraced in the plea agreement, I don't think there is any doubt that he crossed the line.  He joined a dangerous conspiracy to kidnap the Governor and he did so of his own free will, not because Government agents led him down a path that he was unwilling to travel on his own.  On this record I think there is no doubt about that.

So that certainly needs to be reflected in the Court's sentence, and it's why I don't think a minimal custodial sentence is appropriate, but I don't consider 75 months minimal by any stretch of the imagination, though it is below guidelines.

And that's really where I want to go next, because individual matters -- individuals matter, too, and I think all sides, including the Government, recognized that.  And I personally don't think specific deterrence for Mr. Garbin is really needed, at least from what I can see on this record.  He has changed his behavior for sure, but I think he has changed his heart and mind, too, and I think he is an excellent prospect to walk law-abiding paths once he has finished paying for these very serious mistakes.

And I think another person who recognizes that individuals matter, too, is, again, the victim, Governor Whitmer, who points this out in her victim impact statement. She says, "There is room for grace and rehabilitation for those

who recognized the anger that has been unleashed and assisting
in unearthing the hate that has taken root in our society.
This will help reestablish the ideals and aspirations that made
our nation a beacon of possibility and opportunity to the rest
of the world."  And I agree with that, too, and I think this
Defendant, Mr. Garbin, is one of the people who should benefit
from that sentiment in a tangible way in the form of a variance
that I am intending.

We've heard already from both sides.  He has zero
prior issues with law enforcement in the first 24 years of his
life.  He is not just category I criminal history.  It's not
just zero points.  It's zero engagement with law enforcement.
And the Defense brief I think cites some statistical analysis
that suggest that bodes well for success, but I do think it's a
very strong and positive indicator of success going forward.

And he didn't just avoid problems with law enforcement
in the 24 years he has managed despite obstacles to achieve
many important things.  He had some difficulty with traditional
learning, but nonetheless, you got through high school.  He
then went onto earn certification as an aviation mechanic,
which is difficult in its own right, that led to a good,
strong, solidly middle class economic opportunity, and that was
great and probably one of the things that fueled his anger and
disappointment in the immediate aftermath of the lockdowns that
hit the aviation industry particularly hard.

1        But none of that is an excuse for the dark and the

2   unlawful turn he made in response, and in my mind standing

3   alone that wouldn't be a basis for variance either.  At least

4   most of the people I sentence in this court have overcome and

5   faced some obstacles, some more severe than Mr. Garbin.  Some

6   less.  But the question to me at least in the most extreme of

7   cases is how they respond to all of that, their behavior, and

8   how it fits in the overall mix of other factors, not the mere

9   fact that they had difficulties, which I'm sure he did.

10       And that's what's more impressive to me here, not just

11  the words of Mr. Garbin that he is abandoning this path, but

12  the things he has done, concrete things he has done to

13  demonstrate to me that he means it.  And I want to highlight a

14  couple of those, not that we haven't heard about them.  We have

15  already, but I want to highlight the ones that are significant

16  to me.

17       First, he took full responsibility very early in this

18  case to say, I did wrong, I know I did wrong, and I am not

19  going to run away from the consequences.  I think Mr. Satawa

20  was right.  I think it was within the first 60 days of the

21  filing of the complaint and the initial arrest.  It was, in any

22  event, before formal indictment, which is maybe not

23  unprecedented in my 14 years but pretty unusual and certainly

24  unprecedented in a case of this magnitude.  And I think that

25  reflects not just a desire and hope that he would get some kind

of credit for it, but a reflection that once he stepped outside
of that bubble he put himself in and surrounded himself with
people that were not good for him, that facilitated and fueled
that kind of momentum that Mr. Kessler and the Supreme Court
cited back in the Callanan decision.  Once he stepped outside
of that he could exhale and I think in a sense breathe his own
sigh of relief that he was now back in a land he recognized
with people and his family that he recognized who are socially
responsible, and he could take the first step, the first key
step, which is recognition and acceptance of that
responsibility, and I think he did it.  But he went beyond
that.

Secondly, he went onto say I not only want to take
responsibility for myself, I want to undue, to the extent I
can, some of the harm I did.  And he did this again early by
making a full accounting that we heard of from Mr. Kessler
today, from the Defense table, too, and that's more detailed in
the written materials because he wanted to try to do some of
those things that Gretchen Whitmer, Governor Whitmer in her
comments noted.  If you help unearth this kind of thing as its
taking root that's going to help us reestablish the ideals and
aspirations that continue to attract the refugees of the world
to our shores.  Because we don't solve our problems.  We agree
to solve -- by brute force.  We agree to solve our problems
without the butt of a gun, the point of a gun or other brute

force.

And once you make that statement and step forward in the words of, I think, the lawyers in both writing and today, you do put a target on your back, and Mr. Garbin has that.  He has certainly burned a bridge to that dark side.  He is not going back, at least not easily, and I think that augurs well.

And then the third thing that I don't see from everybody but I see from Mr. Garbin, is the decision to reach out to people who can help him, whether it's Parents for Peace or other people who can help him understand and help his family understand what led him into this darkness?  And he did that before I made him do it or anybody else made him do it.  He did it, I think, because he wanted to understand and he wanted tools to make sure this never happened again.  And I see that in the materials that were submitted in advance that that kind of help has taken root, I think, for Mr. Garbin, and I think we are starting to see the fruit of that in his own life and response.

And then the family letters, which, of course, are not unusual.  I think are in the same vein and worthy of a comment. Of course, I get a lot of letters from family members at the time of the sentencing of a loved one, but what strikes me about these, these are from people who have uniformly lived productive and law abiding lives themselves.  They respect the constitution and laws of the country, and in some cases they

fought in the armed forces to defend those values.  And maybe
even more importantly, they make no excuses for what Mr. Garbin
did.  They are not enablers.  They are clear about that he did
wrong.  They are sorry, sad and sometimes ashamed that he did
wrong, and they are not afraid to call it out.  They love him
anyway and are committed to providing the support that he needs
to make sure they never go -- he never goes this route again.
And I think so often it's tempting for family members, despite
their best efforts, to enable the kind of wrongdoing that
landed the offender in front of me in the first place to try to
excuse or minimize it in some way, and this doesn't happen.

Neither did it happen from Parents for Peace or other
groups that are supporting Mr. Garbin with tangible efforts to
help, in their words, deradicalize in my words, help him
understand what happened and get back into the normal side of
the democratic republic.  To have those forceful opinions,
whatever they may be, to advance them peacefully and lawfully
and to abandon and disown any effort to violently pursue those
ends.

So that's why from my perspective something more than
the Government's four-level 5K is needed to reflect that person
in those factors, but still a significant custodial term is
needed in order to demonstrate the seriousness of this to the
public, as well as to Mr. Garbin, though I think he already
knows it, and to deter future conduct from people who might be

1    similarly inclined.

2        I certainly am going to recommend substance abuse

3    assessment and treatment.  We didn't really talk about that

4    much, but there is reference in the PSR and some of the

5    briefing to suggest that Mr. Garbin would benefit from that.

6    And of course educational and vocational opportunities for

7    Mr. Garbin would be welcome and be useful.  So I'll recommend

8    those things as well.

9        Supervision needs to follow.  I intend a period of

10   three years of supervision.  The normal mandatory terms will

11   apply and will include cooperation in the collection of DNA and

12   drug testing.

13       Standard conditions also apply, which means no

14   firearms or other destructive devices or dangerous weapons,

15   among other things.

16       And then the special conditions I intend are as

17   follows.  First, Mr. Garbin needs to provide the probation

18   officer with access to requested financial information.  Two,

19   he needs to participate in a program of substance abuse

20   assessment and treatment paying a portion of the cost as he is

21   determined able.  Three, to use only those computers or other

22   Internet capable devices that are approved in advance by the

23   probation officer.  And related, four, needs to provide the

24   probation officer with user names, e-mail addresses, passwords,

25   social media accounts, any form of ID he uses to create an

account accessible on the Internet.  And those two conditions
are because the pathway here of trouble for Mr. Garbin was the
social media Internet pathway, and we need a chance, an
opportunity to monitor that.

And then fifth and the same vein, Mr. Garbin needs to
submit to the search protocol of the probation office
permitting search of vehicle, papers, computers and the like on
reasonable suspicion.  And then finally, he needs to
participate in the computer monitoring protocol of the
probation office during the term of supervision.

From a financial point of view, the court intends the
special assessment of $100.  I don't intend a guideline fine.
The guideline fine is 40,000 to 250,000 dollars, but there is
no way from my review the finances of Mr. Garbin that he could
afford anything like that.  So I intend a below guideline fine,
$2,500, which will be providing some accountability financially
speaking during the Bureau of Prisons stay.  The minimum
quarterly installment in the Bureau of Prisons' IFRP program is
$25 quarterly.  The minimum monthly installment is $20
otherwise while in custody, and during supervision any balance
remaining I intend to be paid in minimum monthly installments
of $50.

There would normally be a restitution award but there
is no request for one so I do not intend to award that.  And
then the forfeiture will be as it's provided in the preliminary

order of forfeiture I referenced earlier, and we'll include
that in the final order as well.

So that's the overall intended sentences of the Court
and the reasons for it.  We'll start with the Government for
legal objections?

MR. KESSLER:  No legal objections, Your Honor.

THE COURT:  Defense?

MR. SPRINGSTEAD:  No legal objections, Your Honor.

THE COURT:  Okay.  All right.  I am going to go ahead
and impose that as the sentence of the Court, then, Mr. Garbin.
From a custodial term point of view, 75 months, supervision to
follow, three years, one hundred dollar special assessment, a
fine of the $2500, and the forfeiture as described in that
preliminary forfeiture document, and no restitution since none
is requested.

So that's the sentence I am imposing now.  I am going
to make it the written judgment of the Court.  You have a
14-day window to appeal.  You talk to your lawyers.  If there
is something you want to appeal make sure they hear it so they
can put it on file.  If you are at a point that you can't
afford retained counsel anymore and you continue on you can
still file papers with the Court, and if you qualify the Court
can appoint somebody to carry the case for you.  Do you have
any questions about that?

THE DEFENDANT:  No, Your Honor.

1          THE COURT:  Okay.  Mr. Springstead?

2          MR. SPRINGSTEAD:  Yes, Your Honor.  We forgot to ask

3     if he could be placed near his family in Milan?

4          THE COURT:  I don't have any problem with that.  I

5     wondered if you were going to ask for that or if you had other

6     concerns for him, but I will certainly reflect that if that's

7     his desire.

8          Do you have any comment or objection?

9          MR. KESSLER:  No, Your Honor.

10         THE COURT:  I'll add that, then, as one of the

11    recommendations.  Is there anything else today?

12         MR. KESSLER:  Not from the Government today.

13         THE COURT:  Anything else from the Defense?

14         MR. SATAWA:  No, Your Honor.  Thank you.

15         THE COURT:  All right.  Thank you.

16         THE CLERK:  Court is adjourned.

17         (Proceeding concluded, 4:50 p.m.)

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


I, Paul G. Brandell, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.


/s/ Paul G. Brandell

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, Michigan  49503